IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| ARSHAD PERVEZ CHEEMA, | )    Case No. 1:21-cr-00013-AJT |
| | ) |
| Defendant. | ) |
| _____ | ) |

## <u>UNITED STATES' POSITION ON SENTENCING</u>

The United States of America, by and through undersigned counsel, respectfully submits its memorandum in connection with the sentencing of the defendant, Arshad Pervez Cheema ("Cheema" or "the defendant"), in accordance with 18 U.S.C. § 3553(a), Fed. R. Crim. P. 32, and Section 6A1.2 of the United States Sentencing Commission, Guidelines Manual. A sentencing hearing is scheduled for June 23, 2021.

The United States agrees with the United States Probation Office that the resulting offense level is 19 with a guidelines range of 30–37 months incarceration. The United States respectfully requests that the Court sentence the defendant to a guidelines sentence of **30 months** in prison. The defendant owned and operated a doctor's practice in Northern Virginia, and he willfully failed to pay to the IRS the taxes he withheld from his employees' paychecks. Instead, he embezzled the funds to finance an extravagant restaurant venture in Washington, D.C. A sentence of 30 months in prison is sufficient, but not greater than necessary, to achieve the statutory purposes listed in 18 U.S.C. § 3553(a).

# I.   BACKGROUND AND OFFENSE CONDUCT

## A.   Overview of the Case

From 1998 to 2018, Cheema and his wife owned and operated a medical practice in Northern Virginia.  (Presentence Investigation Report ("PSR") ¶ 22.)  Their practice operated under a few different names over the years, including Urgent Health Care and Falls Church Family Care, but in 2010 or 2011, the Cheemas changed the name to Walk-In Medical Center, PC ("WIMC").  (PSR ¶ 22 & n.1; Ex. 1, Cheema MOI ¶¶ 12–13.)  From 2011 through 2018, Cheema served as the President and Director of WIMC, and he exercised significant control over WIMC's financial affairs.  (PSR ¶¶ 22, 31; Ex. 1, Cheema MOI ¶ 15; ECF No. 14, Statement of Facts ("SOF") ¶ 6.)  For example, Cheema routinely signed checks on behalf of WIMC and determined which creditors of WIMC to pay and when to pay them.  (PSR ¶ 31.)  As particularly relevant here, Cheema was also responsible for collecting, truthfully accounting for, and paying over to the IRS certain taxes withheld from his employees' wages.  (*Id.*)

While operating WIMC, Cheema withheld payroll taxes from his employees' paychecks and provided employees with Forms W-2 showing that taxes were withheld.  (PSR ¶ 22.)  Cheema deliberately failed, however, to account for and pay over those withholdings and other associated payroll taxes to the IRS, despite his obligation to do so.  Instead of paying the payroll taxes, Cheema used his employees' withheld funds to renovate, open, and run an extravagant restaurant in Washington, D.C. called Grand Trunk Restaurant.  (PSR ¶¶ 34, 53.)

## B.   Legal Background

As an employer, WIMC was required to withhold federal income taxes and Federal Insurance Contributions Act ("FICA") taxes (commonly known as Social Security and Medicare taxes) from its employees' wages and pay those withholdings to the IRS.  *See* 26 U.S.C. §§ 3102,

3402 & 3403; *see also Erwin v. United States*, 591 F.3d 313, 319 (4th Cir. 2010).[1]  These

withheld sums are commonly known as "trust fund taxes," as employers must hold those

withheld taxes in trust for the United States and pay them to the IRS by making periodic federal

tax deposits throughout the year.  *Erwin*, 591 F.3d at 319; *see also Slodov v. United States*, 436

U.S. 238, 243 (1978).  Trust fund taxes "'exist for the exclusive use of the government, not the

employer,' and may not be used to pay the employer's business expenses." *Newbill v. United

States*, 441 Fed. App'x 184, 187 (4th Cir. 2011) (quoting *Erwin*, 591 F.3d at 319).

       In addition to making the periodic tax deposits, WIMC was also required to report the

trust fund taxes to the IRS by filing a Form 941 ("Employer's Quarterly Federal Tax Return") on

a quarterly basis.  26 U.S.C. § 6011(a); 26 C.F.R. § 31.6011(a)-1.  A Form 941 discloses the

number of employees during the quarter, their compensation, and the amount of money withheld

and remitted to the United States during the quarter.  The Form 941 also discloses an employer's

portion of FICA taxes that must be paid over with the trust fund taxes.  *See* 26 U.S.C. § 3111.

Moreover, after the close of every year, WIMC was required to furnish a Form W-2 to each

employee that itemized, among other things, the employee's wages paid throughout the year and

taxes withheld.  26 C.F.R. § 31.6051-1(a)(1).  Employees then use the Forms W-2 to complete

their personal income tax returns, and the IRS credits employees the taxes reportedly withheld

from their wages that appear on the Form W-2 regardless of whether their employer actually paid

them over to the IRS.

---

[1] Many of the cases cited herein concern the civil statute, 26 U.S.C. § 6672, and not the criminal statute, 26 U.S.C. § 7202.  But § 7202 largely tracks the language of § 6672, and thus, case law construing § 6672 is helpful in construing § 7202.  *See Slodov*, 436 U.S. at 247–48; *see also United States v. Boccone*, 556 Fed. App'x 215, 239 (4th Cir. 2014) (looking to case law from the § 6672 context to inform the § 7202 analysis).

When an employer fails to collect or pay over trust fund taxes to the IRS, the government

may prosecute any person at the company who had a duty to collect and remit the trust fund

taxes but who willfully failed to do so.  26 U.S.C. § 7202.  Section 7202 and its civil counterpart,

26 U.S.C. § 6672(a) "were designed to assure compliance by the employer with its obligation to

withhold and pay the sums withheld, by subjecting the employer's officials responsible for the

employer's decisions regarding withholding and payment to civil and criminal penalties for the

employer's delinquency."  *Slodov*, 436 U.S. at 247.

### C.  Summary of Criminal Conduct

From 2011 through 2018, Cheema owned and operated a doctor's office called WIMC

with offices located in Falls Church, Virginia and Herndon, Virginia.  (PSR ¶¶ 22, 26.)  During

those years, Cheema served as WIMC's President and Director.  (PSR ¶¶ 22, 36, 47.)  He was

responsible for authorizing payroll, determining the financial policy for the business, handling

bills, paying invoices, making purchases, paying taxes, approving leave requests, and hiring and

firing employees on behalf of WIMC.  (PSR ¶ 22; Ex. 1, Cheema MOI ¶¶ 15, 19, 45.)  Cheema

had signature authority over WIMC's bank accounts and signed checks on behalf of WIMC.

(PSR ¶ 31.)  As part of his guilty plea, Cheema admitted that from 2011 through 2018, he was

responsible for collecting, truthfully accounting for, and paying over to the IRS the trust fund

taxes withheld from WIMC's employees' wages.  (SOF ¶ 6.)

In the first year of its existence, WIMC satisfied its payroll tax obligations.  It timely filed

Form 941 tax returns with the IRS and made federal tax deposits for all four quarters of 2011.

(Ex. 3, 2011 Forms 941.)  For that year, Cheema hired a payroll processing company called

Heartland Payment Systems to process its payroll, calculate payroll tax liabilities, pay over

withholdings to the IRS, and file Form 941 tax returns on a quarterly basis.  (Ex. 1, Cheema MOI

4

¶¶ 33–35.)  During that time, Cheema communicated with Heartland to confirm that the payroll bank account had sufficient funds for taxes and wages.  (Ex. 1, Cheema MOI ¶ 35.)  In total, WIMC paid $301,636.55 in wages to its employees and $81,868.18 in payroll taxes to the IRS during 2011.  (Ex. 3, 2011 Forms 941.)

In 2012, things changed.  Cheema stopped using Heartland and decided to process payroll in-house.  (Ex. 1, Cheema MOI ¶ 33; Ex. 2, CPA MOI ¶ 7.)  He hired a patient's daughter, a CPA, to assist with payroll.[2]  (Ex. 1, Cheema MOI ¶ 33.)  Cheema did not give the CPA access to WIMC's payroll bank account (Ex. 1, Cheema MOI ¶ 36; Ex. 2, CPA MOI ¶ 13), and when the CPA was hired, she specifically told Cheema that it was Cheema's responsibility to sign and send Form 941 tax returns to the IRS.  (Ex. 2, CPA MOI ¶ 8.)

From 2012 through 2015, when payroll was due, the CPA prepared payroll packages for Cheema's review that contained payroll tax vouchers for the amounts due to employees and the IRS.  (Ex. 1, Cheema MOI ¶ 36; Ex. 2, CPA MOI ¶ 10.)  The package also contained the Form 941 tax returns that Cheema needed to sign and file.  (*See* Ex. 4, Second Quarter 2013 E-mail with Attachment Excerpt ("I have attached all tax forms for 2nd quarter.  I had dropped these at Herndon office and had used your white envelope and wrote your name on it.").)  Sometimes, the CPA specifically instructed Cheema on where to sign the forms, how much to write the checks for, and where to send the documents to the IRS.  (*See id.* (providing the address for the IRS for "mailing checks for taxes" as well as the amount owed); Ex. 5, Fourth Quarter 2013 E-mail with Attachment Excerpt ("I have attached copy of W-2s and other payroll forms for taxes to be submitted to Fed and State.  Please print and give to Dr. Cheema to write check.  Please

---

[2] The memoranda of interview suggest that Cheema hired the CPA around 2011 (*see, e.g.*, Ex. 1, Cheema MOI ¶ 33; Ex. 2, CPA MOI ¶ 7), but Heartland prepared the payroll for the entire year of 2011 (*see* Ex. 3, 2011 Forms 941).

have him sign at appropriate places before signing.").  Cheema would then write payroll checks for each employee, and he was supposed to submit the withholdings and Form 941 tax returns to the IRS.

Almost immediately upon processing payroll in-house, Cheema began to shirk his payroll tax obligations.  Beginning with the first quarter of 2012, Cheema stopped filing Form 941 tax returns and paying taxes withheld from his employees' wages.[3]  This practice continued for the next four years.  Overall, from the first quarter of 2012 to the first quarter of 2016, Cheema willfully failed to pay over $584,743.29 in payroll taxes for WIMC.[4]  (PSR ¶ 38; SOF ¶¶ 8, 13.)

Cheema's failures were not the product of mere business mismanagement nor an attempt to keep his doctor's practice afloat.  Rather, beginning around 2011 or 2012, Cheema misappropriated funds from WIMC to renovate, open, and operate a Washington, D.C. restaurant called Grand Trunk Restaurant.  (PSR ¶¶ 34, 53, 103; Ex. 1, Cheema MOI ¶ 47.)  Over a course of three years, Cheema paid for all the cost of renovations, furniture, and fixtures before Grand Trunk opened in January 2015.  (PSR ¶ 53; Cheema MOI ¶ 47.)  Cheema's wife corroborated his story, noting that it took three years to renovate the property and that "there were no heating, light, or bathrooms when they first started renovating."  (Cheema MOI ¶ 48.)  Cheema estimated that he took between $10,000 and $20,000 per month from WIMC in 2012, 2013, 2014, and 2015, siphoning close to $1 million in total from WIMC to Grand Trunk Restaurant.  (PSR ¶ 53.)

---

[3] In 2015, Cheema signed and filed Form 941 tax returns for the fourth quarter of 2014 and the first quarter of 2015, but he did not pay any of the corresponding tax due and owing in the amounts of $57,464.20 and $47,904.00, respectively.  (SOF ¶¶ 7, 10.)

[4] This term "payroll taxes" refers collectively to trust fund taxes and the employer portion of FICA taxes described above.  *See* 26 U.S.C. § 3111.

As part of his guilty plea, Cheema admits that he knew WIMC's withheld taxes were due and owing, but he used them to open and run the restaurant.  (SOF ¶ 9.)

Cheema and his family spared no expense in renovating Grand Trunk Restaurant over the three-year period.  When the restaurant opened, the Washington Post painted the following picture:

> [F]aux-crocodile banquettes with rhinestone tufting.  Dozens of Chandeliers.  Televisions on the floors, walls and ceilings, and retro-futuristic swivel chairs surrounding a tandoor oven enclosed within a semi-circular counter that could double as a spaceship's mission control desk.  Every surface is covered in stimuli.  Even the toilets, with heated seats and an adjustable bidet, are fancy.
>
> That's all before you walk down the vertigo-inducing see-through staircase to an underground lair with light-up floors that gives off the simultaneous vibes of Bollywood movie, Las Vegas nightclub and set of "2001: A Space Odyssey." Because there are more than 70 TVs playing at any given time, the room is frenzied with distraction.

*At Grand Trunk, grab a bit, snap a selfie, and carry on*, Washington Post, https://www.washingtonpost.com/goingoutguide/restaurants/at-grand-trunk-grab-a-bite-snap-a-selfie-and-carry-on/2015/03/26/7eaaaaf0-ce68-11e4-a2a7-9517a3a70506_story.html (Mar. 26, 2015).  Indeed, one of the pictures in that article depicts patrons walking on five TVs in the floor at the bottom of a staircase.  Moreover, according to that Washington Post article, Cheema's son claimed that "most of the restaurant's fixtures—like a 3,000-pound community table carved from a single tree—were custom made" and the construction and design of the restaurant cost "seven figures," i.e., at least $1 million.  The pictures available on Google and Yelp offer further insight into the décor:[5]

---

[5] https://www.yelp.com/biz/grand-trunk-washington;











This was not the first time Cheema failed to pay over tax withholdings to the IRS.  Nor was it the first time that Cheema's failures overlapped with his own discretionary and personal investment decisions.  From 2007 through 2009, Cheema failed to file Form 941 tax returns and pay over $328,941.80 in payroll taxes for another doctor's office he operated called Falls Church Family Care PC ("FCFC").  (SOF ¶¶ 16–17.)  This pattern of failing to pay over payroll taxes is often called "pyramiding" in which business owners fail to pay employment taxes, abandon the business, and start operating under a new business name.  *See United States v. Farr*, 701 F.3d 1274, 1281–82 (10th Cir. 2012) (describing "pyramiding").  Here, Cheema pyramided payroll

9

taxes by incurring substantial tax debt under FCFC, abandoning FCFC, and opening the new business called WIMC. And similar to Cheema's restaurant venture beginning around 2012, Cheema's failures to pay over FCFC's payroll taxes came at a time when he and his family sought to flip houses in Washington D.C. (Ex. 6, Excerpt of Revenue Officer's Notes; Ex. 1, Cheema MOI ¶ 73.)

In early 2016, the IRS began auditing Cheema's failure to file Forms 941 and pay over payroll taxes for WIMC. (PSR ¶ 22.) Cheema and WIMC then submitted late-filed Forms 941 and other information to the IRS for some quarters to assist in calculating the amount of taxes owed. (SOF ¶ 11.) As a result of that audit, the IRS assessed substantial taxes, penalties, and interest against WIMC, and assessed the Trust Fund Recovery Penalty ("TFRP") against Cheema under 26 U.S.C. § 6672. (*See* Ex. 7, TFRP Data.) The TFRP is a civil assessment in the amount of the trust fund taxes that Cheema failed to pay over, which rendered Cheema personally liable for those trust fund taxes.

Since 2016, Cheema has not made any substantial effort to pay down the tax due and owing or the TFRP assessments made against him for most quarters from 2012 through 2015. In fact, Cheema has made only one voluntary payment of $100 since February 2016 for tax quarters from 2012 through 2015. (PSR ¶ 54.) And he has the means to pay more. In the Spring 2019, Cheema moved to a low cost-of-living area of the country in Lincoln, Kansas, and until he pleaded guilty recently, he and his wife earned over $550,000 a year in income. (ECF No. 8, Pretrial Services Report.) Just from his hospital salary alone, Cheema earned $325,000. (*Id.*; *see also* PSR ¶ 98.) As reported to probation, Cheema's monthly cash flow after considering $48,866.66 in income *and only $2,750 of expenses* totaled $46,116.66. (ECF No. 8, Pretrial

10

Services Report.)  Cheema could have made substantial progress toward paying off the payroll taxes in just one year.  He has made no such effort.

Finally, as with the payroll taxes, Cheema also failed to file corporate income tax returns or pay the corresponding tax debt that WIMC owed for tax years 2011 through 2017.  (SOF ¶¶ 18–21.)  After the IRS began its civil audit, Cheema filed delinquent corporate income tax returns for many of the tax years at issue, reporting significant unpaid balances on each return.  In total, Cheema admitted that he failed to pay over $1,135,772 in corporate income taxes on behalf of WIMC for tax years 2011 through 2017.

## II.  GUIDELINES CALCULATION

The Fourth Circuit has held that a sentencing court must: "(1) properly calculate the [Sentencing] Guidelines range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentence[s] requested by the parties; and (3) explain its reasons for selecting a sentence."  *United States v. Simmons*, 269 Fed. App'x 272, 273 (4th Cir. 2008) (*citing United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007)).  Although the Sentencing Guidelines are advisory, *United States v. Booker*, 543 U.S. 220, 246 (2005), "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process," *Gall v. United States*, 552 U.S. 38, 50 n. 6 (2007); *see also Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) ("[E]ven in an advisory capacity the Guidelines serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the process of appellate review'").

Here, the tax loss caused by the defendant corresponds to a base offense level of 22.  Because the defendant accepted responsibility for the offense, the government agrees that a two-point reduction under § 3E1.1(a) is warranted.  We are also mindful that the defendant agreed to plead guilty prior to indictment, which saved the government time and resources.  Accordingly, the United

States moves this Court to grant the additional one-point reduction under U.S.S.G § 3E1.1(b).  Taken

together, the defendant's total offense level is 19 with a criminal history category of I.

### III. THE IMPOSITION OF SENTENCE

In addition to considering the properly calculated Guidelines range, the Court must also

consider the other sentencing factors set forth in 18 U.S.C. § 3553(a).  *See, e.g.*, *United States v.

Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  Here, the most pertinent factors include: (a) the

nature of circumstances of the offense and the need to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense, 18 U.S.C.

§ 3553(a)(1), (a)(2)(A); (b) the need to afford adequate deterrence to criminal conduct, *id.*

§ 3553(a)(2)(C); (c) the need to avoid unwarranted sentencing disparities, *id.* § 3553(a)(6); and

(d) the history and characteristics of the defendant, *id.* § 3553(a)(1).  As argued below, based on

the statutory sentencing factors, the government seeks a custodial sentence of **30 months

imprisonment**.

> **A.** ***The Nature and Circumstances of the Offense and the Need to Reflect the
> Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just
> Punishment for that Offense***

"Tax offenses, in and of themselves, are serious offenses."  U.S.S.G. § 2T1.1,

commentary.  Our nation requires and relies on all Americans who enjoy the benefits of this

country to voluntarily pay their fair share.  *See Bull v. United States*, 295 U.S. 247, 259 (1935)

("[T]axes are the lifeblood of government . . . .").  In 2020, the IRS collected approximately $3.5

trillion in taxes, which accounted for 96% of the funding that supported the Federal

Government.[6]  Approximately 70% of all taxes collected by the IRS—and that support the

---

[6] *IRS Progress Update, Fiscal Year 2020*, IRS Pub. 5382.

operation of this country—come from employment taxes, i.e., the taxes the defendant failed to pay over here.[7]

Congress has made employers—like WIMC—critical to tax collection by requiring that federal income taxes and FICA taxes be collected from employees' wages.  *See* 26 U.S.C. §§ 3102, 3402; *see also Baral v. United States*, 528 U.S. 431, 436 (2000) (explaining that payroll withholding is not a separate tax but is a method of tax collection).  The law requires—and the IRS relies on—employers to accurately report wages, withhold federal taxes from the wages, and pay over the withheld taxes to the IRS along with the employer's own FICA taxes.  *See* 26 U.S.C. §§ 3102, 3111, 3301 & 3402.  This is not a complex responsibility governed by intricate rules and regulations.  Employers must merely collect the taxes on their employees' behalf, hold those taxes in trust, and then remit the money to the U.S. Treasury on a quarterly basis.

The defendant's actions in this case undercut this fundamental premise upon which our tax collection system relies.  Every tax crime constitutes a theft from the public at large, but Cheema's actions further violated his duty to pay over his employees' taxes.  While the defendant's employees likely received credit for the taxes withheld but not paid over to the government, Cheema still violated the trust that his employees and the system in general placed in him.  And the government was left holding the bill.  Moreover, not only did the United States lose out on the revenue stream that should have been generated by the defendant's business, but

---

[7] *See A More Focused Strategy is Needed to Effectively Address Egregious Employment Tax Crimes*, TIGTA, at 1 (March 21, 2017), https://www.treasury.gov/tigta/iereports/2017reports/2017IER004fr.pdf ("Employment taxes amount to almost $2.3 trillion (69 percent) of the $3.3 trillion collected by the IRS); Caroline Ciraolo, *White Collar Criminal Investigations Slowing Down? Think Again…The Increase in Employment Tax Prosecutions* (Winter/Spring 2021), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/2021/criminal_employment_tax.pdf ("Employment taxes, including federal income tax actually withheld and paid over to the IRS, constitute over 70% of all revenue collected by the IRS.").

Cheema's actions required the government to expend scarce resources in civilly auditing and criminally investigating the defendant's failures.  The serious nature of the defendant's crimes warrant a significant term of incarceration to preserve the integrity of our tax laws and to provide just punishment for the offense.  *See United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a guidelines sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").

Not only are tax offenses inherently serious, but the Sentencing Guidelines recognize that the dollar amounts involved in tax crimes provide an important measure of the seriousness of the offense both in terms of the defendant's culpability and the need for deterrence:

> [A] greater tax loss is obviously more harmful to the treasury and more serious than a smaller one with otherwise similar characteristics. Furthermore, as the potential benefit from the offense increases, the sanction necessary to deter also increases.

U.S.S.G. § 2T1.1, cmt. backg'd.  The amount at issue here is not insignificant by any means. The defendant admitted that he failed to pay over $2 million of taxes that his doctor's practice owed over the years.  To put that number in perspective, 86.6% of offenders in 2019 caused a tax loss of $1.5 million or less.[8]  In other words, the defendant's tax loss would have placed him at least in the top 13.4% of all offenders sentenced for tax crimes in 2019.

The sheer amount of taxes alone that Cheema failed to pay over to the IRS warrants a significant sentence.  On top of that, though, Cheema's use of the trust fund taxes to finance his restaurant venture highlights the egregiousness of these crimes.  Cheema did not simply

---

[8] *See Quick Facts: Tax Fraud Offenses*, USSG, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY19.pdf.

14

embezzle the trust fund taxes to pay off other creditors for his doctor's practice or otherwise keep his doctor's practice afloat.  Instead, he looted the funds to renovate, open, and operate an extravagant and over-the-top restaurant in Washington, D.C.  The picture painted by the Washington Post article about the restaurant says it all—TVs on the floor, ceilings, and walls; faux-crocodile banquettes with rhinestone tufting; heated toilet seats; dozens of chandeliers; and a custom wooden table carved from one tree.  In short, "[e]very surface [was] covered in stimuli."  Rather than obtain conventional financing through a bank or by other means, Cheema merely used money that did not belong to him or his business and, in turn, cheated the government out of money it should have received.  Cheema's crimes did not result from a desire to keep a business alive.  They resulted from greed.

Finally, the defendant's failures extend beyond one quarter, one tax year, or even one business.  For nearly a decade, Cheema engaged in a pattern of failing to remit withheld employment taxes to the IRS.  Beginning with Falls Church Family Care, the defendant first failed to pay over employment taxes from 2007 through 2009 as he sought to fund his real estate venture in Washington, D.C.  He then made it more difficult for the IRS to collect the taxes due by operating his doctor's practice under a different name, WIMC.  Even if Cheema had legitimate business reasons for switching companies, the long history of failing to pay the withheld taxes heightens his culpability.  That is especially true considering that WIMC initially complied with its payroll tax obligations in 2011 by hiring a payroll processing company.  But once again, Cheema's responsibility to pay over taxes took a backseat to his whim to renovate, open, and operate an extravagant restaurant in Washington, D.C.  Cheema initially sought to get back into the system, but he affirmatively chose to back out when it came time to fund another business interest.

15

### B.  *The Need to Afford Adequate Deterrence to Criminal Conduct*

One of the paramount factors the Court must consider in imposing a sentence under 26

U.S.C. § 3553(a) is the need for the sentence to afford adequate deterrence to criminal conduct.

In tax cases, deterrence serves an even more important role in reducing the amount of money lost

each year through tax fraud.  According to the Sentencing Guidelines, deterrence should be a

primary consideration when sentencing defendants for tax crimes: "Because of the limited

number of criminal tax prosecutions relative to the estimated incidence of such violations,

deterring others from violating the tax laws is a primary consideration underlying these

guidelines."  U.S.S.G. § 2T, Introductory Commentary.  The Fourth Circuit has approved of this

emphasis on deterrence in criminal tax cases, recognizing that "the [Sentencing] Commission's

focus on incarceration as a means of third-party deterrence is wise."  *United States v. Engle*, 592

F.3d 495, 502 (4th Cir. 2010); *see also United States v. Baucom*, 300 Fed. App'x 457, 464–65

(4th Cir. 2010) (unpublished) ("We agree with the government that the district court failed to

adequately consider the need for deterrence . . . [and the Sentencing Commission's] belief that

deterrence of others should be a primary consideration when sentencing tax evaders.").

A term of imprisonment of 30 months is necessary to achieve the goals of general and

specific deterrence, as it would put other would-be tax cheats on notice that willful violations of

the internal revenue laws will be punished with a real possibility of imprisonment.  *See United*

*States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006) ("The goal of deterrence rings hollow if a

prison sentence is not imposed.").  After all, without that deterrent value, "there would be little

incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward

path." *Engle*, 592, F.3d at 502.  Deterring others from flouting the tax laws is of the utmost

importance when punishing criminal tax violations.

Deterrence in the employment tax context plays an enhanced role as well.  All employers in this country are required to pay employment taxes.  As a result, sentences in these types of cases have a wide-reaching effect across the country.  Moreover, employment taxes are a tempting source of funds for small business owners like the defendant.  Some (like the defendant here) embezzle the trust funds to fund outside investments or live lavish lifestyles while others use the money to keep their business afloat.  Regardless of their motivations, this crime is tantamount to theft, and it is important that the sentence reflect the importance of paying over these withheld taxes to the IRS.  After all, trust fund taxes exist for the exclusive use of the government, and they may not be used by the employer for any reason.  Otherwise, there is nothing else to prevent similarly greedy owners from following these methods and forcing the United States to become, essentially, an involuntary creditor to a separate investment venture. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").  Because employment taxes truly are the "lifeblood" of the government—accounting for approximately 70% of the $3.5 trillion collected in taxes each year—a significant term of incarceration might cause others to think twice before using employees' trust fund taxes for the business and depriving the government of what it needs to function.

### C.  *The Need to Avoid Unwarranted Sentencing Disparities*

Courts impose meaningful periods of incarceration for employment tax fraud, and a sentence of 30 months in this case would be in line with sentences others have received recently for similar conduct.

17

For example, in *United States v. Gazdick*, 19-cr-200-AJT (E.D. Va.) (Trenga, J.), this Court sentenced a defendant to 18 months' incarceration for failing to pay $5.35 million in employment taxes to the IRS.  Although the amount of tax loss at issue in *Gazdick* exceeds the amount here, it appears the defendant in *Gazdick* primarily failed to pay over payroll taxes to "keep his business afloat," i.e., "he only was able to stay in business because of his tax fraud." (19-cr-200-AJT, ECF No. 15, at 6.)  The same cannot be said here.  Cheema did not misappropriate funds to prop up a failing business.  In fact, when Cheema hired an outside company to prepare payroll in 2011, his company met all of its employment tax obligations while also turning a profit.  He abandoned his responsibility and embezzled the trust fund taxes to fund an outside investment in a restaurant completely unrelated to his doctor's practice.

This case is more like another case from the Western District of Virginia, *United States v. Harper*, Case No. 18-cr-00025 (W.D. Va.).  In *Harper*, the defendant received a guideline sentence of 41 months in prison after admitting that he used his employees' withheld employment taxes to pay over $1 million in personal expenses, including over $500,000 in stock market investments, over $100,000 in his son's tuition, and over $370,000 in real property purchases.[9]  Similar to *Harper*, Cheema's restaurant venture is just another kind of investment that he made to better his and his family's economic standing.  Cheema poured money from his doctor's practice into overhauling and starting the restaurant so that he could benefit personally. Accordingly, a guidelines sentence is appropriate to address that wrongdoing.

A guidelines sentence in this case would also be consistent with other recent cases outside of this district and circuit.  On June 7, 2021, a New York plumbing contractor was

---

[9] https://www.justice.gov/opa/pr/virginia-pharmacy-owner-sentenced-prison-5-million-employment-tax-fraud

sentenced to 20 months in prison for failing to pay over \$732,462 in employment taxes.[10]  On October 7, 2020, a North Carolina business owner was sentenced to 42 months in prison for failing to pay employment taxes and ordered to pay over \$2 million in restitution.[11]  Overall, a sentence here of 30 months in prison would avoid unwarranted sentence disparities among defendants who have been convicted of similar conduct.

### D.  *The History and Characteristics of the Defendant*

Nothing in the defendant's history mitigates his culpability in this case.  The defendant is a highly educated doctor who made the same choice time and time again to violate the tax laws for his own personal greed.  Although the defendant does not have a criminal history, he consistently violated federal tax laws for over a decade by stealing payroll taxes to fund his outside business ventures.

Moreover, the PSR sets forth a variety of medical conditions that the defendant has experienced over the years.  (PSR ¶¶ 83–88.)  Any argument that the defendant should not face a prison sentence because of his medical conditions lacks merit.  The defendant will receive proper medical care provided by the Federal Bureau of Prisons.[12]  Moreover, the defendant has lived with those ailments for over two decades and they did not stop him from working as a doctor, running a medical practice, or pursuing other investment ventures.  In other words, he committed his crimes while experiencing the same medical conditions that he reports today.  In fact, it appears he undertook his restaurant endeavor in 2012 around the time he had surgery.  (*Id.*)  To

---

[10] https://www.justice.gov/opa/pr/new-york-plumbing-contractor-sentenced-20-months-prison-employment-tax-fraud

[11] https://www.justice.gov/opa/pr/owner-north-carolina-temporary-staffing-firms-sentenced-prison-employment-tax-fraud

[12] https://www.bop.gov/inmates/custody_and_care/medical_care.jsp

the extent the defendant claims that his physical condition has worsened culminating with open-heart surgery in October 2018, it did not prevent him from working numerous jobs at the same time over the past two years.  In the Spring 2019, Cheema and his wife moved to Kansas where he earned $325,000 a year as Chief of Staff and a physician at Lincoln County Hospital as well as manager of the Lincoln County Clinic.[13]  (*See also* PSR ¶ 98.)  Taken together, the defendant's physical or medical condition does not warrant a lighter sentence.

## IV. ORDER OF RESTITUTION

Pursuant to the plea agreement, the defendant has agreed to pay restitution to the IRS in the amount of $2,049,457.12, plus Title 26 interest that runs until the IRS receives payment in full.

## V.  CONCLUSION

For the above reasons, the government respectfully requests that this Court impose a sentence of imprisonment of **30 months incarceration**, restitution in the amount of $2,049,457.12, and three years of supervised release.

//

//

//

//

//

//

//

//

---

[13] https://www.lincolnsentinel.com/news/reception-planned-welcome-doctors-cheema

Dated: June 16, 2021                          Respectfully submitted,

                                              RAJ PAREKH
                                              Acting United States Attorney

                                              */s/ Russell L. Carlberg*
                                              RUSSELL L. CARLBERG
                                              Assistant United States Attorney
                                              United States Attorney's Office
                                              2100 Jamieson Avenue
                                              Alexandria, VA 22314
                                              Telephone: 703-299-3700
                                              Email:Russell.L.Carlberg@usdoj.gov

                                              DAVID A. HUBBERT
                                              Acting Assistant Attorney General

                                              */s/ Casey S. Smith*
                                              CASEY S. SMITH
                                              Trial Attorney, Tax Division
                                              U.S. Department of Justice
                                              150 M Street, N.E.
                                              Mail Stop 1.1505
                                              Washington, D.C. 20002
                                              Telephone: (202) 307-0715
                                              Fax: (202) 514-0961
                                              Casey.S.Smith@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on this 16th day of June 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to counsel of record.

*/s/ Casey S. Smith*
CASEY S. SMITH
Trial Attorney, Tax Division
U.S. Department of Justice
150 M Street, N.E.
Mail Stop 1.1505
Washington, D.C. 20002
Telephone: (202) 307-0715
Fax: (202) 514-0961
Casey.S.Smith@usdoj.gov
