# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA      *

        v.          *     **Case No. 0422 1:21CR00013-001**

ARSHAD PERVEZ CHEEMA      *

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

June 16, 2021

Jay R. Nanavati
Fed. Bar No. 44391
Kostelanetz & Fink, LLP
601 New Jersey Ave., NW
Suite 260
Washington, D.C. 20001
jnanavati@kflaw.com
*Counsel for Arshad Pervez Cheema*

Caroline D. Ciraolo
Fed. Bar No. 453882
Kostelanetz & Fink, LLP
601 New Jersey Ave., NW
Suite 260
Washington, D.C. 20001
cciraolo@kflaw.com
*Pro Hac Counsel for Arshad Pervez Cheema*

i

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... ii

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

DR. CHEEMA'S HISTORY AND CHARACTER ..................................................................... 6

a. Dr. Cheema's Personal and Family History............................................................................ 6

b. Dr. Cheema's Dedication to Patients and Employees.............................................................. 9

c. Dr. Cheema's Work Mentoring the Next Generation ........................................................... 14

d. Dr. Cheema's Community Efforts ....................................................................................... 16

e. Dr. Cheema's Declining Health .......................................................................................... 17

f.  The Fateful Misstep of Grand Trunk .................................................................................. 19

g. Dr. Cheema's Fresh Start In Kansas ................................................................................... 22

h. The Pandemic..................................................................................................................... 26

THE ADVISORY GUIDELINES CALCULATION ............................................................... 27

APPLICABLE LAW ............................................................................................................... 28

A Downward Variance Is Warranted ....................................................................................... 29

   1) The Nature of the Offense.............................................................................................. 29

   2) The History and Characteristics of the Defendant .......................................................... 31

   3) The Purpose of Sentencing ............................................................................................ 35

   4) The Kinds of Sentences Available .................................................................................. 38

   5) The Guidelines ............................................................................................................. 45

   6) Pertinent Policy Statements of the Sentencing Commission ............................................ 46

   7) The Need to Avoid Unwarranted Disparities Among Similar Offenders ......................... 46

   8) The Need for Restitution................................................................................................ 53

DR. CHEEMA'S PRECARIOUS HEALTH ........................................................................... 54

CONCLUSION....................................................................................................................... 57

# **TABLE OF AUTHORITIES**

## **Cases**

*Cunningham v. California*, 549 U.S. 270 (2007) ................................................................. 30

*Gall v. United States*, 552 U.S. 38 (2007) .................................................... 29, 38, 42, 43

*Koon v. United States*, 518 U.S. 81 (1996) ....................................................................... 29

*Rita v. United States*, 551 U.S. 338 (2007) ...................................................................... 30

*United States v. Abramove,* No. 16-cr-613 (S.D.N.Y. Apr. 5, 2017) .............................. 55

*United States v. Adams,* 19-cr-546 (M.D.N.C. Nov. 13, 2020) ................................ 58, 59

*United States v. Adelson,* 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ....................... 6, 32, 33, 50

*United States v. Angiulo,* 20-cr-10218 (D. Mass. Mar. 18, 2021) (Sentencing) ........ 5, 45

*United States v. Barbour,* No. 19-cr-174 (E.D. Va. Nov. 23, 2020) (Sentencing) ......... 52

*United States v. Betancourt,* No. 19-cr-20684 (S.D. Fla. Mar. 11, 2020) (Sentencing) ....... 53, 54

*United States v. Booker,* 543 U.S. 220 (2005) .................................................................. 30

*United States v. Choi,* No. 20-cr-6 (D.D.C. Oct. 15, 2020) (Sentencing) ....................... 54

*United States v. Cooper,* 394 F.3d 172 (3d Cir. 2005) ..................................................... 34

*United States v. Courtney,* 76 F. Supp. 3d 1267 (D.N.M. 2014) ..................................... 40

*United States v. Danh,* No. 20-cr-318 (D. Md. May 21, 2021) (Sentencing) ................. 44

*United States v. Del Campo,* 695 F. App'x 453 (11th Cir. 2017) .................................... 40

*United States v. Denko* 20-cr-15 (E.D.N.Y. May 28, 2021) (Sentencing) ...................... 57

*United States v. DiFabio* No. 18-cr-262 (D. Conn. Apr. 29, 2021) ................................ 55

*United States v. Duva,* No. 29-cr-181 (E.D. Pa. Sept. 17, 2019) (Sentencing) .............. 44

*United States v. Edwards,* 595 F.3d 1004 (9th Cir. 2010) ............................................... 39

*United States v. Gazdick,* No. 19-cr-200 (E.D. Va. Nov. 8, 2019) (Sentencing) .......... 52, 55, 56

*United States v. Gogineni* No. 20-cr-81 (E.D. Va. Feb. 2, 2021) (Sentencing) ......... 55, 56

*United States v. Harper,* No. 18-cr-25 (W.D. VA. Nov. 16, 2018) (Sentencing) ......... 56, 57

*United States v. Hassebrock,* 663 F.3d 906 (7th Cir. 2011) ............................................ 57

*United States v. Hodges,* No. 10-cr-624, 2014 WL 3695491 (E.D.N.Y. July 23, 2014) ......... 42

*United States v. Howe,* 543 F.3d 128 (3d Cir. 2008) ....................................................... 33

*United States v. Jackson,* No. 19-cr-492, 2020 WL 2759601 (S.D.N.Y. May 26, 2020) ......... 64

*United States v. Key,* No. 15-cr-37 (E.D. Va. May 6, 2015) (Sentencing) ..................... 44

*United States v. Manley,* No. 17-cr-53 (E.D. Va. Sept. 15, 2017) (Sentencing) ......... 35, 54

*United States v. Martin,* 520 F.3d 87 (1st Cir. 2008) ................................................................64

*United States v. Moore,* 344 Fed. App'x. 767 (3d Cir. 1990) ...................................................38

*United States v. Mousseau*, 599 F. App'x 726 (9th Cir. 2015) ................................................41

*United States v. Nesbeth,* 188 F. Supp. 3d 179, 194 (E.D.N.Y. 2016) ....................................41

*United States v. Paper,* No. 13-cr-599 (D. Md. Mar. 11, 2014) (Sentencing) ..........................43

*United States v. Parris,* 753 F. Supp. 2d 744 (E.D.N.Y. 2008) ...............................................50

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) .............................................................41

*United States v. Po*, No. 15-cr-367 (E.D. Pa. May 11, 2017) (Sentencing)...............................44

*United States v. Popina*, No. 17-cr-68 (E.D. Va. Nov. 20, 2017) (Sentencing) ........................ 5, 34, 44, 54

*United States v. Pursley*, No. 18-cr-575 (S.D. Tex. Aug. 12, 2020) (Sentencing) .............. 52, 53

*United States v. Ragsdale* No 18-cr-13 (E.D. Va. May 2, 2018) (Sentencing)...........................54

*United States v. Ramanulla*, No. 15-cr-181 (E.D. Va. Oct. 23, 2015) (Sentencing).................54

*United States v. Ramos*, No. 18-cr-30009, 2020 WL 1478307 (D. Mass. Mar. 26, 2020) ........62

*United States v. Rebecca Adams* 19-cr-546 (M.D.N.C. Nov. 13, 2020) (Sentencing) ...............58

*United States v. Ross*, 912 F.3d 740 (4th Cir. 2019)..................................................................32

*United States v. Russell Rucker*, No. 19-cr-6 (S.D. W.Va. Jan. 27, 2020) (Sentencing) ............57

*United States v. Shamilzadeh,* No. 04-cr-1094 (E.D.N.Y., Apr. 1, 2008) (Sentencing) ............47

*United States v. Skelos*, No. 15-cr-317 (KMW), 2020 WL 1847558 (S.D.N.Y. Apr. 12, 2020)...............61

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ...............................................................41

*United States v. Taffaro*, 919 F.3d 947 (5th Cir. 2019) .............................................................34

*United States v. Taffaro*, No. 17-cr-135 (E.D. La. June 8, 2018) (Sentencing) .........................35

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) .............................................................33

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009).................................................................34

*United States v. Venuti,* No. 10-cr-235 (D. Md. Nov. 2, 2010) ................................................43

*United States v. Warner*, 792 F.3d 847 (7th Cir. 2015) ............................................................. 5

*United States v. Warner*, No. 13-cr-731 (N.D. Ill. Jan. 14, 2014) (Sentencing)...................48, 49

*United States v. Woods,* 19-cr-546 (M.D.N.C. Jul. 9, 2020) (Sentencing) ...............................59

*United States v. Zukerman*, No. 16-cr-194, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020)...................61, 63

## Statutes

18 U.S.C. § 3551.........................................................................................................................42

18 U.S.C. § 3553.....................................................................................................................passim

18 U.S.C. § 3561.........................................................................................................................42

18 U.S.C. § 3562.........................................................................................................................42

18 U.S.C. § 3563.........................................................................................................................42

18 U.S.C. § 3582 .................................................................................................. 38

18 U.S.C. § 3583 .................................................................................................. 42

20 C.F.R. § 404.468 ....................................................................................... 49, 60

26 U.S.C. § 6201 ............................................................................................... 3, 60

26 U.S.C. § 6331 .................................................................................................. 60

26 U.S.C. § 7202 ............................................................................................. passim

26 U.S.C. § 7203 .................................................................................................. 43

26 U.S.C. § 7206 .................................................................................................. 44

31 U.S.C. §§ 5324(a)(1) and (d)(2) ..................................................................... 45

K.S.A. 65-2836(c) .................................................................................................. 3

## Sentencing Guidelines

U.S.S.G. § 2T1.6 .................................................................................................. 29

U.S.S.G. § 2T4.1(I) .............................................................................................. 29

U.S.S.G. § 3E1.1 .................................................................................................. 29

U.S.S.G. § 5F1.3 .................................................................................................. 46

U.S.S.G. § 5Fl.2 ............................................................................................. 42, 45

## Other Authorities

Alan Ellis, John R. Steer, and Mark H. Allenbaugh, *At a "Loss" for Justice-Federal Sentencing for Economic Offenses*, 25 WTR Crim. Just. 34 (2011) ................................................. 50

Benjamin A. Barsky, *et al*, *Vaccination Plus Decarceration – Stopping Covid-19 in Jails and Prisons*, N. Engl. J. Med 2021 (Apr. 29, 2021) ............................................................. 61, 62

Chas Danner & Paola Rosa-Aguino, *What We Know About the Dangerous COVID B.1.617.2 (Delta) Variant*, N.Y. Mag: Intelligencer (June 6, 2021) ................................................. 62

Darren Gowen, *Overview of the Federal Home Confinement Program,* 64 Fed. Probation, 1, 12 (Dec. 2000) .................................................................................................. 45, 46

Federal Bureau of Prisons, *BOP: COVID-19 Update* ................................................. 61

Federal Criminal Defense Clinic, University of Iowa Law School, *They Are Human Too: 256 Deaths in BOP Custody, An Incalculable Loss* .................................................. 61

IRS Publication 1494, Tables for Figuring Amount Exempt from Levy on Wages, Salary and Other Income (Forms 668-W(ACS) and 668-W(ICS) (Rev. 2021), ................................. 60

Jamie Fellner, *Old Behind Bars: The Aging Prison Population in the United States*, Human Rights Watch (Jan. 27, 2012) .................................................................................. 35

Madeline Holcombe & Holly Yan, *A New Coronavirus Variant is on the Rise. Here's Why Experts Are Concerned*, CNN Health (June 14, 2021) ............................................................................................ 4

Michael Tonry, Intermediate Sanctions In Sentencing Guidelines, Nat'l Inst. of Justice (1997) .............. 46

Nat'l Inst. of Corr., U.S. Dep't of Just., *Correctional HealthCare: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004)................................................................................. 36

National Institute of Justice, U.S. Dep't of Justice, *Five Things About Deterrence* (May 2016)............... 39

Nicola Davis, *Delta Variant Causes More than 90% of New Covid Cases in UK*, the Guardian (Jun. 11, 2021) ......................................................................................................................................... 62

Office of Probation and Pretrial Services, Administrative Office of the U.S. Court, *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service,* 2005 ............. 46

Office of the Inspector General, U.S. Dep't of Just., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* at 51 (last revised Feb. 2016) ............................................................... 36, 37

Social Sec. Admin., *What Prisoners Need to Know* (Dec. 2018) ....................................................... 49, 60

Terry Carter, *The Judge Who Said No*, ABA Journal, Oct. 2013 ............................................................ 30

U.S. Attorney General, *Memorandum to Director of Bureau of Prisons re Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020) ............................ 63

U.S. Center for Disease Control, *COVID-19 & Older Adults* (Updated May 14, 2021) ............................ 63

U.S. Sentencing Comm'n, *2019 Annual Report and Sourcebook of Federal Sentencing Statistics* ..... 35, 51

U.S. Sentencing Comm'n, *2020 Annual Report and Sourcebook of Federal Sentencing Statistics* ....... 5, 52

U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* (May 3, 2010) ............................ 51

World Health Org., *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* (Feb. 28, 2020)................................................................................................................................. 63

## PRELIMINARY STATEMENT

Pursuant to 18 U.S.C. § 3553(a) and the United States Sentencing Guidelines ("the Guidelines"), Defendant Arshad P. Cheema ("Dr. Cheema") respectfully submits this Sentencing Memorandum and requests that the Court vary from the Guidelines and impose a probationary sentence with conditions of home detention and 400 hours of community service. Such a sentence is punitive, provides a substantial benefit to the community, provides for restitution, and is sufficient but not greater than necessary to afford adequate deterrence. In support of this proposed sentence, we respectfully request that the Court consider the following points.

*"Each of us is more than the worst thing we've ever done."*

Bryan Stevenson

Dr. Cheema's life has been dedicated to the care and assistance of others. He is a devoted husband, father, brother, cousin, uncle, and community member. He is a kind, compassionate, and empathetic medical provider and first responder who has treated tens of thousands of patients, many for little or no fees. He is a life-long mentor and community volunteer who is well known and respected for giving back and providing for those who need assistance. This is evident from the more than 70 letters written on Dr. Cheema's behalf by family, friends, patients, mentees, employers, colleagues, former employees, and members of his community. In determining an appropriate sentence, we ask the Court to review these letters and consider Dr. Cheema's long history of service.

One patient writes:[1] "I first meet Dr. Cheema in 1998, at Medina Market located in Herndon VA where I am employed till to this day as a butcher. My job does not offer health

---

[1] English is a second or third language for many of the authors of the character letters cited herein. We have quoted directly from the text, without correcting typographical errors.

1

insurance, when Dr. Cheema found out he told me to visit his clinic for any type of medical needs. Since then, Dr. Cheema has provided me with the best medical care at affordable cost." Ex. A at 21 (Ltr. from Azhar Mahmood). This experience is shared by numerous others, including Delawar Hussain: "Ever since he started his practice as a family doctor in early 1991 in Fairfax county healthcare was not available to most of the population in this area. People with sicknesses could not get to the health care providers due to the cost. Dr. Cheema's office was taking care of people for less fees and his office was always crowded with low income and immigration people to seek medical help. I know so many people who were getting free help for a long time." Ex. A at 25 (Ltr. from Delawar Hussain).

Dr. Cheema has spent decades training and mentoring the next generation of first responders and health care heroes. For example, Lehra Bogino writes: "I am a practicing Virginia and District of Columbia Nurse Practitioner in family medicine, and I also served as a bedside nurse in intensive care during the worst of the COVID crisis last year. I would not have been able to continue in the advancement of my career, had it not been for Dr. Arshad Cheema." Ex. A at 71 (Ltr. from Lehra Bogino). She goes on to explain that, "Dr. Cheema, a family friend on my husband's side, accepted my application to study under him for an entire year, to allow me to gain the hours and experience that I needed for my Master's of Nursing program at George Washington University approximately four years ago. I had emailed, called, and visited over 200 clinics, constantly hearing 'no, we are not taking students' or 'no, we are booked', and most of the time, not hearing anything at all. It was an extremely stressful time in my life[.] … After hearing my struggles and conducting a proper interview, [Dr. Cheema] graciously took me on as a student, and continued to provide me education for an entire year, just so I wouldn't have to struggle to

find another clinical location." Ex. A at 71 (Ltr. from Lehra Bogino). As set forth in greater detail below, Ms. Bogino is not alone in her praise of Dr. Cheema as a teacher and mentor.

In addition, we ask the Court to consider that Dr. Cheema has fully cooperated with the Government throughout its investigation and promptly pleaded guilty to willful failure to collect, truthfully account for, and pay over employment taxes in violation of 26 U.S.C. § 7202.  He also agreed to an order of restitution for all tax due, thereby providing the Internal Revenue Service ("IRS") with additional tools to collect following the criminal proceedings pursuant to 26 U.S.C. § 6201(a)(4), timely filed all of his income tax returns, and fully paid his individual income tax liabilities, including for tax year 2020.

Dr. Cheema accepts full responsibility for his actions and he continues to pay a heavy price for his willful conduct. His home and business properties have been foreclosed, his employment has been terminated, his license in Virginia is suspended,[2] his license in Kansas will likely be the subject of revocation proceedings,[3] his Medicare privileges were revoked,[4] his health has deteriorated, and any future income, including his Social Security benefits, will be the subject of levies for the rest of his life. Dr. Cheema's conduct also resulted in the termination of his wife's employment. He is ashamed and humiliated, and knows that his decisions have caused others to suffer. He is committed to spending the rest of his life making amends.

We also ask the Court to consider Dr. Cheema's age and precarious health. He is 66 years old and suffers from cardiovascular disease, severe asthma, high cholesterol, hypertension, glaucoma, kidney stones, allergies, and migraines.[5] He has seven stents in his heart, one of which

---

[2] Ex. B, Virginia Consent Order (April 21, 2021).
[3] *See* K.S.A. 65-2836(c).
[4] Ex. C, Notice of Revocation of Medicare Privileges (May 5, 2021).
[5] Medical records substantiating all references to Dr. Cheema's medical conditions and medications have been provided to U.S. Probation Officer Rachael Meyer.

3

required surgery as late as October 2018, and is prescribed a host of medications, including four inhalers, Famotidine, Montelukast, Rosuvastatin, Cyclosporine, Nebivolol, and Nitroglycerin. One of his medications requires monthly injections that cost $2,000 per dose and is only covered by insurance if administered in a hospital. Even more than most individuals his age, in light of his underlying conditions, Dr. Cheema is particularly vulnerable and susceptible to contracting illnesses that can be life-threatening. While he is vaccinated for COVID-19, the Bureau of Prisons ("BOP") is simply unable to implement Centers for Disease Control and Prevention ("CDC") guidance regarding social distancing and sanitation which are especially necessary in light of the more contagious Delta variant currently spreading in the United States.[6]

Based on the foregoing, and as explained in much greater detail below, the Government's assertion that nothing in Dr. Cheema's history mitigates his culpability could not be further from the truth. Dr. Cheema is not a career offender or someone who set out to violate the law. As noted by so many of the individuals who wrote in support of Dr. Cheema, his conviction is an aberration in an otherwise honorable, trustworthy, selfless, and law-abiding life. Dr. Cheema's personal history and characteristics, and the relevant facts and circumstances, clearly take this case out of the heartland contemplated by the Guidelines.

Finally, contrary to the Government's recommendation, a Guidelines sentence of 30 months of incarceration far exceeds the median sentence of 10 months imposed on all defendants convicted of tax crimes with no criminal history.[7] Moreover, a probationary sentence is consistent

---

[6] *See* Madeline Holcombe & Holly Yan, *A New Coronavirus Variant is on the Rise. Here's Why Experts Are Concerned*, CNN Health (last updated 5:44pm June 14, 2021) (noting that "about 10% of Covid-19 cases in the US can be attributed to the Delta variant" and that the Pfizer vaccine was found to provide only "79% protection against infection")

[7] U.S. Sentencing Comm'n, *2020 Annual Report & Sourcebook* 81 tbl.27 (2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf

with sentences imposed upon similarly situated defendants, including those who have dedicated to their lives to serving others, cooperated with the government's investigation, and/or have extremely poor health. *See, e.g.,* Judgment, *United States v. Angiulo,* 20-cr-10218 (D. Mass. Mar. 18, 2021), Dkt. 38 (sentence of probation following guilty plea for failure to account, collect for, and pay over employment tax in violation of 26 U.S.C. § 7202 and a Bank Secrecy Act violation where defendant suffered from health problems and had a history of on service to the community); Judgment, *United States v. Popina*, No. 17-cr-68 (E.D. Va. Nov. 20, 2017), Dkt. 22 (sentence of probation following guilty plea for violation of 26 U.S.C. § 7202 where defendant suffered from multiple heart stents, diabetes, and hypertension); *see also United States v. Warner*, 792 F.3d 847, 861 (7th Cir. 2015) (affirming sentence of probation on defendant who caused substantial tax loss based on his charitable contributions and attempts to self-report foreign bank accounts).

As noted, Dr. Cheema accepts full responsibility for this conduct and is prepared to be held accountable for his crime. We implore the Court to impose a probationary sentence with home detention and community service in lieu of incarceration, which could amount to a death sentence, a penalty disproportionate to the conduct.

## **PROCEDURAL BACKGROUND**

On December 31, 2020, Dr. Cheema entered into a plea agreement, admitting to and accepting full responsibility for the willful failure to collect, truthfully account for, and pay over employment taxes in violation of 26 U.S.C. § 7202. Dkt. 13. Following his initial appearance and guilty plea on February 12, 2021, the Court granted Dr. Cheema release pending sentencing. Dkt. 12. Dr. Cheema's sentencing date was set for June 23, 2021, and he has fully complied with all conditions of his release.

## DR. CHEEMA'S HISTORY AND CHARACTER

Considering a defendant's history and character fulfills the "elementary principle of weighing the good with the bad" and putting "the immediate misconduct ... in the context of [the defendant's] overall life hitherto," at the "moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006), *affirmed* 301 F. App'x 93 (2d Cir. 2008). Dr. Cheema's history and character demonstrate many positive attributes, but as reflected in each of the character letters collectively attached hereto as Exhibit A, Dr. Cheema's dedication to serving others is the most remarkable. Through these sincere and heartfelt letters, a clear and compelling picture emerges. Of course, to truly understand Dr. Cheema, we start at the beginning.

### a.    Dr. Cheema's Personal and Family History

Dr. Cheema was born in 1955 in Sargodha, Pakistan. He is the sixth of eight children born to Mohammad Fazil Cheema and Ghulam Cheema. His father died in a tragic tractor accident when Dr. Cheema was only eight years old. His mother died from a heart attack in 1995. Dr. Cheema's living siblings all reside in Pakistan, including his sisters Parveen Qamar, age 80, Tanveer Khalida, age 75, and Sarwat Sultana, age 72, and brothers Mohammad Javed Cheema, age 69, Shams Naveed Cheema, age 62, and Aamir Cheema, age 60. His sister, Musarrat Jehan, passed away on March 13, 2021 at age 78 after suffering kidney failure. Dr. Cheema is close with his siblings and speaks with them regularly.

Dr. Cheema was raised on a farm in Chak No. 47, a small village near Sargodha. His father built a small home for the family of ten as well as three or four other families that they took in after the families fled persecution in India. Neither the house nor the village had electricity. At age 11, three years after his father died, Dr. Cheema began working on his family's farm before and

6

after school to support his family. He would walk to school, which was outdoors because there was no building, and then walk back and continue his farm work, often stopping to pick up groceries. Dr. Cheema's childhood is characterized by hard work and limited means, but he describes this time in his life in good terms.

Dr. Cheema knew he wanted to care for others at a young age, and with the encouragement of his family, he attended Government College in Lahore, Pakistan and thereafter, Allama Iqbal Medical School. In college, Dr. Cheema formed "an organization which paid anonymously the students college fees which they could not afford because there is no college loan system in the country." Ex. A at 62 (Ltr. from Dr. Mubashar Choudry). In medical school, Dr. Cheema was a "very active member of the patient Welfare Society, helping patients who could not afford medications." Ex. A at 62 (Ltr. from Dr. Mubashar Choudry). After graduation from medical school in 1982, Dr. Cheema worked in the surgery department of a local hospital and for the Raza Clinic before starting his own private practice in Pakistan.

Dr. Cheema met his wife, Dr. Yasmin Cheema,[8] a Canadian citizen, in 1976 during medical school. Yasmin recalls meeting her husband during "a hot summer in Lahore" when he was "collecting donations to buy books for some students who could barely pay their tuition." Ex. A at 1 (Ltr. from Yasmin Cheema). She found Dr. Cheema "to be a selfless, hardworking and compassionate person," and married him in 1981. Ex. A at 1 (Ltr. from Yasmin Cheema). The Cheemas have two sons, Salman Pervez Cheema, age 37, and Kamran Fazil Cheema, age 32.

In 1984, Yasmin sponsored Dr. Cheema for Canadian citizenship and the following year, when Salman was two years old, Yasmin began her medical residency in pediatrics in the United

---

[8] We refer to Dr. Yasmin Cheema as "Yasmin" to avoid potential confusion.

States. Dr. Cheema remained in Pakistan, practicing medicine, caring for Salman, and when possible, traveling back and forth to the United States to visit Yasmin.

The family ultimately reconnected in the United States and while Yasmin worked, Dr. Cheema studied to take his medical exam and took on primary responsibilities at home. Yasmin reports that Dr. Cheema "has always been a loving father who managed a busy work schedule while meeting his family obligations." Ex. A at 1 (Ltr. from Dr. Yasmin Cheema). Salman and Kamran concur, noting that their father was always there throughout their childhood. *See* Ex. A at 4 (Ltr. from Salman Cheema); *see also* Ex. A at 5 (Ltr. from Kamran Cheema). He "taught us so many things about life in his patient and calm manner." Ex A. at 4 (Ltr. from Salman Cheema). By way of example, when Salman refused to attend his first day of school, Dr. Cheema assured him that he would be right outside, and, "[t]rue to his promise as always, he spent the entire day in the parking lot advising and rescheduling his patients for a late evening visit." Ex A. at 1 (Ltr. from Yasmin Cheema). Decades later, Dr. Cheema was waiting again, this time outside the intensive care unit of Quiron Salud Hospital in Barcelona, Spain. Kamran was hospitalized with a severe case of COVID-19. Despite efforts of Yasmin and hospital staff to convince him to rest, Dr. Cheema "sat in the lobby day and night to reassure Kamran that he was close by, and there for him." Ex A. at 1 (Ltr. from Yasmin Cheema); *see also* Ex. A at 5 (Ltr. from Kamran Cheema) ("[K]nowing that he was nearby gave me tremendous strength to fight the infection.").

Dr. Cheema's compassion extends beyond his immediate family. His sister-in-law, Parveen Chowdary, describes the "steady and unwavering" support he provided while her mother's health declined. Ex. A at 8 (Ltr. from Parveen Chowdary).

> Since 1988 I lived alone with my parents in Herndon, taking care of them as they aged. I dealt with watching my father suffer through multiple myeloma, a blood cancer, that would take his life in 2002. Then as my mother slowly lost her mobility and slipped into dementia, finally passing away in 2018. I was her sole caretaker in

the last years of her life, and there were many moments when I did not know how to find the strength to continue caring for her.

My one constant that I could rely on all those years was Arshad. He would drop everything and come help me with everything ranging from issues with my house or car, to administering medical care to my parents. Whether it was early in the morning or late at night he was always there for us when we needed him, without complaint and without fail. There were instances where I would be so often distracted taking care of them I injured myself, one time cutting my arm badly enough that I required sutures. Knowing that I could not leave my elderly mother to even go to the Emergency Room, Arshad came to our home late at night to suture me.

He helped to renovate my home by himself when my mother could no longer climb the steps, putting in a bathroom for her to use on the main level and adding a wheelchair ramp to our garage. What he did for us was not something he felt an obligation to do out of family duty, I know this because he did it for all of his patients and their families. He is just always there for them, steady and unwavering in his support.

Ex. A at 7–8 (Ltr. from Parveen Chowdary). Other family members speak to receiving the benefits of Dr. Cheema's kindness and charity. *See* Ex. A at 9 (Ltr. from Shuja Warraich) ("In the 1990s he helped us in the process of purchasing our first home. He understood the process of purchasing a home and helped us communicate with real estate company and the lender. He took his personal time to answer our questions and help fill out the required paperwork."); Ex. A at 10 (Ltr. from Asad M. Ahmad) ("During my wife's sickness, he made sure he was constantly in touch with me for support whether it was mentally or emotionally, he was there with us.")

**b. Dr. Cheema's Dedication to Patients and Employees**

Dr. Cheema began his medical career in the United States caring for the members of our armed services at the Veterans Affairs Medical Center in Washington, D.C. *See* Ex. A at 67 (Ltr. from Syed Ishaq, MD). In 1998, while he volunteered at a free clinic in Herndon, Virginia, Dr. Cheema and Yasmin opened Falls Church Family Care, in Falls Church, Virginia. Dr. Cheema practiced family medicine, Yasmin practiced pediatrics, and they primarily served low-income and

9

immigrant communities. *See* Ex. A at 92 (Ltr. from Mossadaq Chughtai) ("His waiting room was a tapestry of all those who have made the DMV[9] their home: Latinos, African-Americans, Middle Easterners and South Asians among others. Sickness doesn't check to see if a person has insurance and neither did Dr. Cheema – all patients were treated with the same care and dignity he showed everyone."). Dr. Cheema became a U.S. citizen on June 24, 1999.

In 2002, the Cheemas opened a second medical clinic, Urgent Health Care, in Herndon, Virginia, and in 2003, they hired their first physician assistant. From 2008 to 2009, they opened two more offices in Alexandria, Virginia. Between 2008 and 2011, the Cheemas changed the name of their practice twice, first to "Walk-In Medical Care" because they learned that "Urgent Care" led to higher insurance premiums, and second to "Walk-In Medical Center," after being sued mistakenly on two separate occasions because another medical practice had the same name.[10]

Patient care has always been Dr. Cheema's top professional priority. When he opened his first practice in 1998, "he initiated free medical services for low-income and uninsured individuals through ACHN [ADAMS Compassionate Healthcare Network]," a nonprofit organization and network of doctors, hospitals, and testing facilities providing low or no cost care to those in need. Ex. A at 90 (Ltr. from Liaqat Ali Khan, past Board Member of American Red Cross, Loudon Chapter and founding member of ACHN). In addition, Dr. Cheema has been approached by various organizations to provide assistance and has always answered the call:

> I am the Executive Director at the Foundation for Appropriate and Immediate Temporary Help (FAITH). FAITH is a grassroots organization that is committed to empowering all members of the community. FAITH's mission is to provide humanitarian and financial aid to low-income and needy individuals and families living in the Northern Virginia area.

---

[9] DMV refers to the geographic area that includes Washington, D.C., Maryland and Virginia.
[10] Despite the Government's memo suggesting otherwise, Dkt. 19 at 9, 15, there is no evidence of any nefarious purposes for changing the names of the medical practices.

We serve many types of clients in need; some require seeking a medical doctor and cannot afford medical services. As a small non-profit located in Herndon, VA, we were able to find Dr. Arshad Cheema and he kindly offered to see our clients at no charge and provided them with sample medications.

There are many stories of Dr. Cheema helping FAITH's clients with no charge. These clients were either those with no health insurance or inability to pay any money for a doctor's visit. There were many clients that FAITH referred to Dr. Cheema. He was always happy to serve the needy and the poor. He never refused anyone.

Ex. A at 89 (Ltr. from Ambreen Ahmed).

I am an obstetrician and gynecologist running a free hospital, Koohie Goth Women Hospital for poor women of Pakistan located in rural part of Karachi, Pakistan. I was introduced to Dr. Cheema about 16 years ago when I was trying to find a doctor who can treat poor Pakistani families living in Virginia without insurance and resources. He not only treat them medically but also help them financially if required. I am very thankful to him for all his continuous support to these poor people.

Ex. A at 66 (Ltr. from Dr. Shershah Syed).

Dr. Cheema also frequently reduced or waived his fees for existing patients when they were unable to pay for medical services. Ex. A at 35 (Ltr. from Khalid Hamid Baig) ("Dr. Arshad Cheema came to our rescue and continued our medical care without insurance and many a times without any charges. He was such a blessing at that difficult time, when we were bearing heavy expenses of our children's education and I was the only earning member of my family."); Ex. A at 31 (Ltr. from Iffat Zaidi) ("He was more than willing to make exceptions for payments when times were tough and help get the care needed during illnesses. This doctor is a staple of goodness in humanity and embodies everything you would wish for in a family physician."); Ex. A at 39 (Ltr. from Muhammed Aslam Tanoli) ("I am a self-employed taxi driver. I have known Dr. Arshad Cheema since 2000. He has been a great physician to me and my family. He provided us medical coverage at reduced cost. … He has always helped low income families and immigrants get access to low cost medical services."); Ex. A at 40 (Ltr. from Nabeel Janjua) ("I can confirm that Dr.

Cheema has helped out in assisting our family multiple times in financial struggles related to medical expenses. I also know that he has provided the same assistance to vast amounts of families. Dr. Cheema is an extremely unselfish individual and he always has given back to the community.").

For Dr. Cheema's patients, reduced cost or free treatment never equated to substandard care. Aisha Ahmad describes taking her brother, who suffers from cerebral palsy, for a routine checkup with Dr. Cheema: "when it was our turn to see him he asked me not to take my brother out of the car because it will be a lot of hassle for my mom and myself to take him out and bring him inside. Instead he came outside with his nurse for checkup." Ex. A at 14 (Ltr. from Aisha Ahmad). Nabila Benavides writes about Dr. Cheema's care for her elderly mother: "he would make sure that she would have early appointments and would get her in and out of the office as quickly and efficiently as possible due to her disability …. Dr. Cheema would come to our house and examine my mom during his lunch hour, even if it was for a minor ear infection or some slight pain. From time to time, he would call just to check in on her. I don't know any doctor that would care enough to do that." Ex. A at 41 (Ltr. from Nabila Benavides).

Muhammad Ikram describes the time he called Dr. Cheema after his young son suffered a head wound late at night:

> Unsure what to do, I called Dr. Cheema for his help explaining my son was crying and was in pain due to the cut he got on his head. He advised me to bring him immediately to the clinic despite the late hours and he especially drove from his home to open the clinic. By the time we get to his clinic, he was waiting for us outside ready to help. He immediately cleaned and nursed the wound, and then applied stitches to the injury. After performing all the required checkups, he let us go with the promise to check in for his continued support.

Ex. A at 76 (Ltr. from Muhammad Ikram). Chaudry Siddiq describes a similar event: "I came to Dr. Cheema and he provided care and surgery to my son's injury late at night during his closing

time. He worked overtime into the night to help my son. This is the type of person that Dr. Cheema has been the entire time that I have know him. He has always been very helpful to his patients and goes the extra mile." Ex. A at 24 (Ltr. from Chaudry Siddiq).

When Dr. Cheema cannot provide the necessary care because the medical issue falls outside his specialty, he does his very best to provide other assistance. Anam Mian shares how Dr. Cheema provided support for her father, who was diagnosed with esophageal cancer: "Although he is not an oncologist he provided my family with immense moral support and the will to persevere during such a difficult period. From constantly checking in on my father's progress to providing hope to us as a family, Dr. Cheema was there. Not as a doctor, but as a friend who felt deep empathy due to the difficulty that unfolded my family." Ex. A at 17 (Ltr. from Anam Mian). Similarly, when Delawar Hussain suffered a severe injury to his spine, Dr. Cheema visited him in the hospital every day and after his discharge, checked on him regularly over the next seven weeks. *See* Ex. A at 25 (Ltr. from Delawar Hussain).

Hasiba Faris Muhamed describes calling Dr. Cheema when her child was rushed to the emergency room: "[I]n less than one hour I saw him in the emergency room talking to the doctors and asking about my son health, he came to us and explained the situation and gave us some advises." Ex. A at 29 (Ltr. from Hasiba Faris Muhamed). When Ms. Muhamed's  husband was deployed overseas, Dr. Cheema stayed in touch: "Dr. Cheema never forgot about us and he used to call me almost every week to make sure that my babies are fine and healthy." Ex. A at 29 (Ltr. from Hasiba Faris Muhamed)*.* Being there for his patients in times of crisis is nothing new for Dr. Cheema. Safdar Hussain credits Dr. Cheema with saving his father's life: "He noticed something with my father that we all had missed and instantly told us to bring my dad to his office. Turns out,

my father needed a heart bypass that we would never have known without the help of Dr. Cheema." Ex. A at 48 (Ltr. from Safdar Hussain).

Dr. Cheema's patients are consistent in their admiration, respect, and gratitude, using similar terms to describe their doctor and their friend. *See* Ex. A at 12–13 (Ltr. from Abduallahi Nur Yusuf) ("person of compassion, good character, and morals … trustworthy, kind, and reliable … a great and decent human being."); Ex. A at 14 (Ltr. from Aisha Ahmad) ("generous, kind, and devoted character"); Ex. A at 15 (Ltr. from Amer Rauf) ("kind and gentle man and a very empathetic and humble Doctor."); Ex. A at 17 (Ltr. from Anam Mian) ("immense care, humility, and patience."); Ex. A at 53 (Ltr. from Tazamal Janjua) ("dependable, compassionate, sacrificing, and always giving back."); and Ex. A at 22 (Ltr. from Babar Khan) ("very sincere, responsible, and caring doctor."). Hasiba Faris Mohamed may have said it best: "I have met many doctors over the years, but few have had the kindness and patience that Dr. Cheema does, he was always cheerful and willing to assist us, also he has great respect in the community and among his patients." Ex. A at 30 (Ltr. from Hasiba Faris Mohamed).

### c.   Dr. Cheema's Work Mentoring the Next Generation

Despite his overflowing schedule, Dr. Cheema found the time to mentor future medical professionals and allowed countless high school and college students to shadow him while he worked. *See* Ex. A at 5 (Ltr. from Kamran Cheema) ("Whenever any of my university or high school friends wanted to intern in my father's clinics to learn more about the medical field, he kept his doors wide open."). He mentored students as they pursued their degrees and during their residencies. *See, e.g.,* Ex. A at 59 (Ltr. from Madiha Khan, MD FACOG) ("Dr. Cheema was my mentor and played a pivotal role in helping me achieve my goal to become a physician. The care and compassion he exudes towards his patients was something I aspired to have."); Ex. A at 63

(Ltr. from Nael Rehman) ("Dr. Cheema has taught me thing that you can't learn from the books. He taught me humanity, patience and the ethical implications when dealing with patients.").

Dr. Cheema also spent two decades working with Howard University's Physician Assistant Training Program and working with students studying to be nurse practitioners at George Washington and George Mason Universities. Through these efforts, Dr. Cheema not only provided opportunities for young people in his community, but fostered empathy and compassion in future generations of medical professionals. Dr. Showieb A. Shuja shadowed Dr. Cheema at the clinics: "With permission from his patients, I was able to shadow him at his medical practice as a pre-med college student. This experience positively affected my outlook on the patient physician relationship. I was able to witness his caring nature towards his patient, many who were from a disadvantaged socio-economic background." Ex. A at 11 (Ltr. from Showieb A. Shuja, MD).

Jahangir A. Syed, now a physician in training, has been a patient of Dr. Cheema's since he was a child, growing up "in a multigenerational household in which my granddad, parents, an aunt, an uncle, my brother and I resided. We had one family doctor for us all, Dr. Cheema[.]" Ex. A at 69 (Ltr. from Jahangir A. Syed) ("It has always amazed me how many generations a single pair of hands had a role in healing."). Mr. Syed shares his experience working with and learning from Dr. Cheema: "I spent several hours learning from him and shadowing him, he took valuable clinic time to impart knowledge and make sure all my questions were answered despite hectic clinic schedules. However, what impressed me most was how genuinely empathetic he was to the challenges his patients were facing and coming up with different ways to achieve therapeutic goals for patients." Ex. A at 69–70 (Ltr. from Jahangir A. Syed) ("He continues to be someone I aspire to be like."). Mosufa Zainab, a graduate student at the National Institute of Health, shares a similar

view: "Dr. Cheema is a patient teacher, a generous mentor, a skilled physician, and an incredibly honorable human." Ex. A at 75 (Ltr. from Mosufa Zainab).

### d. Dr. Cheema's Community Efforts

Dr. Cheema has always been committed to his surrounding communities and his contributions go well beyond provision of medical services. He arranged fundraising events "for schools, kids, religious place[s], community upgrades and social activities within the Fairfax area." Ex. A at 25 (Ltr. from Delawar Hussain). "Before his restaurant his Washington, DC closed, Dr. Cheema always donated leftover food to those in need." Ex. A at 98 (Ltr. from Zafar and Lubna Ahmed). "His selfless services inspired young members of my family and their friends in helping the weak and downtrodden in the larger society." Ex. A at 54 (Ltr. from Waqar Ahmed).

Sabahat L. Khan credits Dr. Cheema with his involvement in Junior Achievement USA, the world's largest organization to help teach financial literacy to young adults:

> The only reason I took a part of this initiative at work is because of my father's good friend Dr. Arshad Cheema. My father and Dr. Cheema have been friends since 1998. I met Dr. Cheema for the first time at a repast for my paternal grandfather in 2007. My father made it a point to introduce my siblings and me to Dr. Cheema. After exchanging pleasantries, Dr. Cheema asked me what kind of legacy was I going to help my grandfather leave behind. We saw Dr. Cheema later at a fundraiser he was hosting for his brother's NGO, the Ghazali Trust. This 501C organization helps disadvantaged children pursue higher studies who would not be able to afford to do due to their family's economic standing. They also have a school, Dar-e-Arqam in Sargodha Pakistan to help underprivileged children obtain basic education. The land for this school was donated by Dr. Cheema's mother, Ghluam Sakina.

Ex. A at 47 (Ltr. from Sabahat L. Khan).

Dr. Cheema also helps the international community. As noted by Mr. Khan, Dr. Cheema and his brother formed "Ghazali Education Trust," a fundraising program for Pakistani orphans to obtain an education. Their "fundraising efforts are directly responsible for providing food, clothes, shelter, medical care, and an education to many. In addition, Dr. Cheema's efforts led to providing

clean water for thousands of villagers and the general public in Pakistan." Ex. A at 98 (Ltr. from Zafar and Lubna Ahmed). Dr. Cheema also "took up leadership positions with APPNA – the national Pakistani-Americans doctors' association, to find ways that Pakistani-American physicians could better serve their patients' needs both here in the U.S. from Katrina to Haiti and to many other catastrophes around the world and to Pakistan on medical missions to where many of them trained and the healthcare situation is much worse." Ex. A at 92 (Ltr. from Mossadaq Chughtai).

Dr. Cheema is also a good friend to many, taking on "the stresses of all his friends, always providing a strong shoulder to lean on, a sympathetic ear, and an ever-smiling face." Ex. A at 93 (Ltr. from Dr. Muhammad Zafar Iqbal). Majid Hussain summed it up well: "His very genuine helpful nature for those in need has always been a source of amazement to me because very few people who achieve the education and position he has achieved will stop to personally attend to the physical needs of others less fortunate." Ex. A at 36 (Ltr. from Majid Hussain).

### e.  Dr. Cheema's Declining Health

In 1998, Dr. Cheema suffered his first heart attack at age 43 during his third year of residency at Prince George's Hospital Center in Cheverly, Maryland. He was rushed to Washington Hospital Center emergency room where he underwent surgery to balloon one of his coronary arteries after doctors detected a blockage. One month later, Dr. Cheema had a second heart attack because the same vessel was almost completely blocked. Doctors inserted two stents to open and expand the arteries.

In June 2008, Dr. Cheema experienced severe chest pain and was rushed to Fairfax Hospital, where doctors determined that two arteries were almost completely blocked. Stents were placed in both arteries. In 2011, Dr. Cheema was unwell for many months and doctors performed

17

another cardiac catheterization. He suffered periodic symptoms for several months thereafter. In December 2012, when he experienced severe chest pain again, doctors performed another cardiac catheterization, found two more blockages in his heart, and inserted two more stents.

In March 2016, Dr. Cheema experienced prolonged malaise, fatigue and breathlessness and another stent was placed in his heart. On September 28, 2018, Dr. Cheema was rushed to the emergency room after experiencing severe chest pain and shortness of breath. Doctors identified the narrowing of multiple large arteries and an obstruction of one of the seven stents in his heart at that time. On October 3, 2018, Dr. Cheema underwent two-vessel bypass open-heart surgery. He was discharged from the hospital on October 10, 2018 and recovered at home for six weeks. This was followed by months of cardiac care. He carries nitroglycerin at all times in case he experiences exertion or spasms.

In addition to cardiovascular disease, since 1997, Dr. Cheema has suffered from severe asthma that has been exacerbated in recent years. He is prescribed four different inhaled steroids and bronchodilator inhalers to manage this condition: Ventoline, Advair, Spiriva, and Singulair. In 2016, Dr. Cheema's asthma required the use of the inhalers every 3 to 4 hours. He also experienced prolonged heart palpitations (tachycardia). His cardiologist placed him on a Holter monitor and determined that the premature ventricular contractors were likely due to the inhalers. He was prescribed Verapamil for the contractions and Bystolic to slow his heart rate and lower his blood pressure. He currently utilizes nebulizers at home and, when the symptoms become severe, he takes oral steroids. These medications have intensified his heart problems.

In May 2021, Dr. Cheema met with his pulmonologist because his asthma has worsened and become resistant to his medications. His doctor prescribed a new medicine delivered through a monthly injection. The injection costs $2,000 and Dr. Cheema's current insurance only covers

the expense if the injection is given in the hospital. He received his first injection on May 27 and the second injection is currently scheduled for June 24, the day after sentencing. Dr. Cheema has provided his updated medical records to the U.S. Office of Probation.

Due to the prolonged use of oral steroids, Dr. Cheema has narrow angle glaucoma in his right eye and has lost substantial vision in his left eye. He was diagnosed with posterior subcapsular cataract, for which Dr. Cheema underwent cataract surgery on his left eye in September 2020, and that now requires similar surgery on his right eye. The surgery on the second eye is scheduled for July 5, 2021. Each surgery requires at least two weeks for recovery.

Dr. Cheema is prescribed Crestor to manage his cholesterol level and takes Pepcid every day to prevent gastritis. Dr. Cheema has suffered from migraine headaches for many years. After avoiding an episode for seven or eight years, the migraine headaches returned in 2020 as a result of stress. He currently experiences migraine headaches every two or three weeks for which he takes Tylenol and Advil. Finally, Dr. Cheema suffers from painful kidney stones every two or three years for the past 40 years. He should be taking medication to reduce the formation of the kidney stones.

Dr. Cheema's poor health had a substantial adverse impact on his ability to manage his medical practice, further contributing to his disorganization and failure to satisfy his tax obligations. Dr. Cheema already "had absolutely no understanding of how to run a business," and "could not keep up with his mounting debts." Ex. A at 3 (Ltr. from Salman Cheema). The multiple medical episodes, along with the extended recovery periods, made matters that much worse.

### f.  The Fateful Misstep of Grand Trunk

In 2011, the Cheema family was presented with an opportunity to lease property in Washington, D.C. and open a restaurant. No one in the family had experience owning or operating

a restaurant. Nonetheless, the family believed that they could quickly open and operate a profitable eatery that could generate revenue to pay their other mounting liabilities. Dr. Cheema supported this decision in part because he was concerned that the family's primary source of income – the medical practice – could end with his premature death.

 The Grand Trunk was a financial disaster, starting with the initial lease that required not only monthly payments that began at approximately $12,000 and increased over time, but also the payment of the landlord's property taxes. The initial plan was to use the first few months – which were rent-free – to build out the property and open quickly. However, at every turn, there were problems. The initial appeal of a historic building was quickly dispelled in light of a basement filled with mud, inadequate utilities, and a crumbling roof. Providing the required gas, electricity, and water required local permits, major construction on Indiana Avenue, and finally, government inspections, all of which took a substantial period of time.

After signing the lease and incurring the initial costs, the Cheemas felt they were too far in to walk away. To reduce costs when they were ready to furnish the restaurant, the family sought used equipment and inexpensive furnishing. The décor included numerous televisions, which were purchased on sale at a local electronics store, and the furniture looked unique but was inexpensive. Media reports to the contrary are simply incorrect. These facts are supported by the low insurance coverage the family obtained on the tangible business property.[11]

During this time, Dr. Cheema had very limited resources, continued to suffer various medical ailments, and was having difficulty managing the medical practices. On many days, he was simply unable to work due to health issues, medical procedures, and exhaustion. By 2012, Dr.

---

[11] *See* Ex. D (Grand Trunk Insurance Policy).

20

Cheema had no choice but to close one of the medical clinics in Alexandria. In 2014, he closed the second Alexandria location.

Four years after signing the lease, the restaurant finally opened in 2015. Unfortunately, despite a strong opening and hope for a recovery, the Cheemas lost their primary customer base after nearby government offices closed following the 2016 elections and change in administration. The restaurant traffic declined and the Cheemas ultimately closed operations on February 28, 2019.

Around the same time, Dr. Cheema was unable to make the mortgage payments on the Falls Church business property. In 2017, the lender foreclosed. When it became clear that the remaining medical practice could not meet current and past due financial obligations, the Cheemas were forced to close and transition the patients to other providers.

Dr. Mohammed Akbar, a colleague who has known Dr. Cheema for 25 years, accepted some of his former patients "and found out that he provided so much free care to patients who could not afford to pay for services. He provided his personal cell phone to needy patient, so they have direct access to him for medical and non-medical issues." Ex. A at 61 (Ltr. from Mohammad Akbar, MD). Dr. Hameed U. Peracha agrees: "In my experience half of his office patients were getting free treatment or nominal charges because most of his patients population belong to uninsured and less fortunate population. Unfortunately by providing charity to the peoples he hurt himself financially and for the time being professionally." Ex. A at 57 (Ltr. from Hameed U. Peracha, MD).

Dr. Cheema experienced similar difficulties with the family home and in 2019, the lender foreclosed. Dr. Cheema and Yasmin were left in an even worse position than they started in 2011—facing even more debt and looking for a path forward. Despite these hardships, and unlike so many

21

others, Dr. Cheema refused to consider filing for bankruptcy protection. He was adamant that he would work as much as possible and do his very best to pay all of his debts.

### g.  Dr. Cheema's Fresh Start In Kansas

In April 2019, Dr. Cheema and Yasmin accepted employment with Lincoln County Hospital in Lincoln, Kansas, a rural farming community in need of qualified medical professionals. Steven Granzow, the former Chief Executive Officer of Lincoln County Hospital describes Lincoln County as a "frontier county" with "an underserved rural population." Ex. A at 84 (Ltr. from Steven Granzow). The hospital has 14 beds, and when Dr. Cheema and his wife joined, there was not a single adult care physician in the county. Ex. A at 84 (Ltr. from Steven Granzow).

Dr. Cheema wore many hats at Lincoln County Hospital. He was the Chief of Medical Staff and the only physician who cared for acute and chronic adult patients. In October 2019, he was appointed the Director of Emergency Medical Services, treating patients in the emergency room, making critical decisions for patient care, developing protocols for medicine lists, and guiding paramedics by phone as they transported patients to the hospital. Dr. Cheema was responsible for making critical decisions in emergencies, such as whether a helicopter or ambulance should be used to transport a patient to a tertiary center in Kansas City or Wichita.

Prior to his arrival, patients were forced to transfer from Lincoln County Hospital to receive treatment in subspecialties. Dr. Cheema established a process to communicate with subspecialists in nearby cities and facilitate the care for his patients, which allowed most of the patients to receive the care they needed without being transferred. If a patient required transfer to a tertiary center, Dr. Cheema closely followed their care and continued to follow up with them after they were discharged. He ensured the smooth running of operations for staff and identified and sought to recruit medical professionals to provide optimum care for the hospital and the community.

Dr. Cheema also served as the Medical Director of Lincoln Park Manor, a 40-bed nursing home. He was responsible for providing care to residents and maintaining operations, including during the COVID-19 pandemic. The number of patients under his direct care at Lincoln Park Manor increased from 20 to 30 due to his level of care and compassion.

In addition, Dr. Cheema agreed to serve as the Director of the Lincoln Medical Clinic and in this role, converted the outpatient clinic in Lincoln County to an all-day walk-in clinic to create greater accessibility to healthcare for the local residents and surrounding towns. He treated patients with a wide variety of issues. For example, he cared for a patient who suffered a stroke and then turned to a patient who suffered a dislocated shoulder from being kicked by a cow.

Finally, Dr. Cheema served as Director of the Sylvan Grove Medical Clinic, which provided much needed medical care to the local community. The clinic operated three days per week and provided general medical services including allergy injections, minor surgeries, school physicals, and annual wellness visits. Dr. Cheema supervised four to five nurse practitioners and treated adult patients each week. The clinic closed after the start of the COVID-19 pandemic.

His new colleagues in Lincoln County quickly recognized Dr. Cheema's dedication to his patients and the surrounding community. Abbie Weigel, a nurse practitioner at Lincoln County Hospital, describes how Dr. Cheema helped the community during a very difficult time, when their previous physician retired and the community was left without a doctor.

> Lincoln can be a difficult practice to "take over" and I feel that Dr. Cheema did this very well. I feel that he went above and beyond to help the patients in our practice. He gave them all his personal cell phone number to be contacted at any time and gave this number out to the community. I believe this showed great character on his part and his vested interest in the health and well-being of our community. He was always very professional with me and also the patients. He was soft spoken and seemed gentle with patients. He was also very kind and willing to help as my supervising physician.

Ex. A at 79 (Ltr. from Abbie Weigel).

Figure 1. Dr. Cheema having a conversation with a patient before a procedure.



Jeanine Cromwell, head Licensed Practical Nurse at Lincoln Medical Clinic, describes her

experience with Dr. Cheema:

> I found him to be one of the most knowledgable and caring professionals that I have
> had the pleasure of working with. It was always obvious that the welfare of each
> patient was of the utmost importance in his practice. He would devote as much time
> as necessary for his patients to feel comfortable and listen intently to any of their
> concerns. His attention to detail to assess the correct diagnosis and plan of care
> always left no stone unturned.

Ex. A at 82 (Ltr. from Jeanine Cromwell). She was shocked when Dr. Cheema provided his cell

phone number to patients and was willing "to see to housebound patients that were unable to come

to the clinic." Ex. A at 82 (Ltr. from Jeanine Cromwell). "A doctor who makes house calls these

days is definitely one for the record books." Ex. A at 82 (Ltr. from Jeanine Cromwell). Ms.

Cromwell worked at Lincoln Park Manor nursing home as well, and reports that "more and more

of the residents requested to change to Dr Cheema simply by observing him attending to their

friends or roommates" because "they wanted that special care he showed to include them as well."

Ex. A at 82 (Ltr. from Jeanine Cromwell).

Andrea Lynn Rinaldo is a Family Nurse Practitioner with 35 years of experience. She met

Dr. Cheema when he arrived at Lincoln County Hospital, after the community lost its physician of

more than 30 years and the hospital was in financial crisis. She describes Dr. Cheema as follows:

> He arrived with a positive, cheerful attitude. He was open to listening to the internal and external struggles of both community and staff. He was caring and compassionate to not only the patients and residents but also to the staff. Dr. A Cheema quickly began regaining patients from the community and the local nursing home to help rebuild our patient roles. He personally met each and every patient that came into the clinic and gave them his personal cell number so they could reach him at any time. This is a community of mainly farmers and ranchers who have little time to come to the doctor and a large demographic of elderly who do not have the resources to understand the importance of regular health care visits. He built a relationship of trust and mutual respect with the community as a whole assisting them in receiving the healthcare they needed.

Ex. A at 80 (Ltr. from Andrea Lynn Rinaldo). She also explains Dr. Cheema's valuable

contributions to the medical staff:

> As a mentor, he provided much needed support and consultation to the existing staff of mid-levels who had been relying on remote telemedicine physician support.
>
> * * * * *
>
> In my years of experience from Level 1 trauma centers in large communities to small primary care clinics I have experienced a wealth of educated and caring providers but Dr. A Cheema is exceptional. He is truly a caring, compassionate human being with a deep commitment to his fellow man. He always looked out for those around him and was selfless in his giving of time and energy. The mid-levels I worked with all had a deep respect for his personal touch and willingness to help. He could, and would be, contacted at all hours of day or night for patient consultation and was never disagreeable, unavailable or unwilling to help even when he was not the responsible back-up provider. This is a rarity.

Ex. A at 80–81 (Ltr. from Andrea Lynn Rinaldo).

### h. The Pandemic

In March 2020, when the COVID-19 pandemic struck, Dr. Cheema was ready and willing to assist in any way possible. Over the next year, he provided crucial assistance to Lincoln County residents despite his age and poor health making him particularly vulnerable to the virus.

In consultation with an intensivist at Salina Regional Health Center in Salina, Kansas, Dr. Cheema coordinated COVID-19 care protocols in rural hospitals. He consulted with the Lincoln County Health Department on government public health orders. He guided Lincoln Park Manor nursing home with respect to protocols and guidelines to reopen the facility, and he was the final authority responsible for approving the reopening plan. He even conducted COVID-19 research that was submitted to and accepted by the American Board of Family Medicine.

By August 2020, there were 138 active coronavirus clusters in Kansas and outbreaks at nursing homes resulted in approximately half of the fatalities. As the only doctor for adult patients in Lincoln County and the nursing home medical director, Dr. Cheema's presence was vital to monitoring the health of the community and guiding the community through COVID-19 and its aftermath.

In light of the social distancing requirements and fear of infection, Dr. Cheema introduced telemedicine practices to the county and established procedures to protect healthcare professionals from exposure. The protocols included meeting and treating patients in the outdoor ambulance area of Lincoln County Hospital, testing for COVID-19 via blood draw, and preparation of social isolation instructions and home kits that included antipyretics, an inhaler, and a thermometer.

Figure 2. Dr. Cheema conducting a COVID-19 test in an ambulance bay.



In sum, "Dr. Cheema provided valuable services to [the Lincoln County] communities before and through the recent pandemic." Ex. A at 84 (Ltr. from Steven Granzow). Notwithstanding this reputation, and his extraordinary efforts during the COVID-19 pandemic, Lincoln County terminated his employment as a result of his conviction in February 2021. Dr. Cheema agreed to the voluntary surrender of his license to practice medicine in Virginia, and is facing revocation of his medical license in Kansas.

Dr. Cheema has led an extraordinary life marked by service and compassion. He believes that he still has much to offer and can continue to serve his community through mentoring, training, and patient navigation services so desperately needed in many low income and immigrant communities.

## THE ADVISORY GUIDELINES CALCULATION

Dr. Cheema pleaded guilty to a single count of willful failure to collect, account for, and pay over employment tax in violation of 26 U.S.C. § 7202. Dr. Cheema and the Government agree that the base offense level is 22 pursuant to U.S.S.G. §§ 2T1.6 and 2T4.1(I). Because Dr. Cheema

"has clearly demonstrated acceptance of responsibility for the offense," and "has assisted authorities in the investigation or prosecution of [his] own misconduct by timely notifying authorities of the intention to enter a plea of guilty," the Government has agreed to recommend a three-level reduction pursuant to U.S.S.G. § 3E1.1, resulting in an adjusted offense level of 19. Because Dr. Cheema has no criminal history, the applicable advisory Guidelines range is 30-37 months. As U.S. Probation Officer Meyer notes, "Due to [Dr. Cheema's] negative net worth, lack of financial assets, restitution obligation [$2,049,457.12] and lack of employment, it appears he is incapable of paying a fine, the costs of incarceration or the costs of supervision." Presentence Investigation Report, ¶ 106.

## APPLICABLE LAW

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). In arriving at a reasonable sentence, the judge must "make an individualized assessment based on the facts presented" in a particular case. *Gall v. United States*, 552 U.S. 38, 50 (2007).

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49. However, "[t]he Guidelines are not the only consideration." *Id*. Rather, the Guidelines provide a "starting point" for the Court's sentencing considerations. *Id.*; *accord Cunningham v. California*, 549 U.S. 270 (2007).

Moreover, a court should not presume "that the Guidelines range is reasonable." *Gall,* 552 U.S. at 50. Instead, under *United States v. Booker*, the Court should consider each factor set forth in 18 U.S.C. § 3553(a) in determining an appropriate and reasonable sentence. 543 U.S. 220, 259–

60 (2005). In *Rita v. United States*, 551 U.S. 338, 347–48 (2007), the Supreme Court summarized the now oft-cited factors found in that second paragraph:

> (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution.

In considering these factors, the Court need not find "'extraordinary circumstances' to justify a sentence outside of the Guidelines range." *Gall,* 552 U.S. at 47; *see* Terry Carter, *Judge Jed Rakoff's Stance on the SEC Deals Draws Fire, Praise—And Change*, ABA Journal, (Oct. 2013) (the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." Judge Rakoff).[12]

### A Downward Variance Is Warranted

**1)  The Nature of the Offense**

Dr. Cheema's crime is not one of highly sophisticated and complex tax fraud nor is it one borne out of a desire to maintain a "high flying" lifestyle. The Cheema family did not live in an extravagant house, drive expensive cars, take luxury vacations, or collect art, antiques or expensive jewelry. Dr. Cheema is a classic example of someone who is wonderful in their area of expertise – here, medicine – but has little financial acumen or understanding of how to properly manage and operate a business. *See* Ex. A at 3 (Ltr. from Salman Cheema).

In 2007, after hiring physician assistants and as his health continued to deteriorate, Dr. Cheema fell behind on his employment tax obligations. He came into compliance in 2011, but fell behind again in 2012. Instead of reducing personnel or closing the practices, Dr. Cheema willfully

---

[12] https://www.abajournal.com/magazine/article/judge_jed_rakoffs_stance_on_the_sec_deals_draws_fire_praiseand_change.

chose to pay net wages and hope that he would catch up. He focused on patient care and sought alternative sources of income – from working longer hours to unsuccessful attempts to flip real estate and operate a restaurant. Rather than solve the problem, these efforts further jeopardized his health and drove him deeper into debt. Dr. Cheema now understands that this approach was not only negligent, but criminal, and he is paying a heavy price for his decisions. Ex. A at 5 (Ltr. from Kamran Cheema).

Dr. Cheema cooperated with the IRS throughout its investigation. For example, in late September 2018, IRS special agents visited the medical clinic for the purpose of interviewing Dr. Cheema. Unfortunately, Dr. Cheema was being rushed to the emergency room and would later endure open heart surgery. He was released from the hospital on October 10, 2018, and shortly thereafter, called the IRS to schedule the interview at his home. When the U.S. Department of Justice authorized prosecution in 2020, Dr. Cheema promptly entered into a plea agreement. In doing so, he not only saved the Government substantial time and effort, but also eliminated the risk of exposing investigative agents to possible COVID-19 infection while conducting interviews and serving subpoenas in the midst of the pandemic.

By 2019, the Cheemas' debts far exceeded their ability to pay. The proceeds from the sale of the restaurant were applied to outstanding rent and tax liabilities. The Cheemas used their remaining resources and income to pay outstanding individual income tax liabilities, substantial medical expenses, some outstanding loans, and professional fees. In addition, the IRS and the State of Virginia garnished Dr. Cheema's wages from Lincoln County Hospital. Dr. Cheema is determined to pay his liabilities and will do everything he can to satisfy the outstanding debt to the Internal Revenue Service.

2) **The History and Characteristics of the Defendant**

As the court in *Adelson* noted, if Dr. Cheema is ever to receive credit for the good he has done, it is now, as he stands before this Court, having accepted full responsibility for his conduct, seeking mercy. *See* 441 F. Supp. 2d at 513–14. "This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *Id.*; *see also United States v. Ross*, 912 F.3d 740, 744–46 (4th Cir. 2019) (vacating sentence and remanding for further proceedings because district court did not consider defendant's "non-frivolous" mitigating arguments with respect to history and characteristics).

A variance is appropriate where, as here, the defendant has lived an extraordinarily good and law-abiding life. *See Adelson*, 441 F. Supp. 2d at 507, 513–15 (substantial downward variance where defendant's "past history was exemplary," "persons from all walks of life . . . attest[ed], from personal knowledge, to [the defendant's] good works and deep humanity," and defendant demonstrated an "ever-present willingness to go above and beyond the call of duty to help others."); *see also United States v. Howe*, 543 F.3d 128, 130, 137, 141 (3d Cir. 2008) (affirming a sentence of home detention and probation instead of 18-24 months of incarceration where defendant's life was marked by outstanding devotion to family, community, and church); *United States v. Thurston*, 544 F.3d 22, 24, 26 (1st Cir. 2008) (affirming a three-month sentence for Medicare fraud conspiracy of more than $5 million based on, among other things, defendant's support and assistance of others).

Dr. Cheema's life has been dedicated to serving others. From his time in Pakistan, when he solicited donations to help his classmates, through his early days in the United States when he

31

volunteered at the Veterans Affairs Medical Center and local clinics while helping members of the community, to his decades as a physician, providing care regardless of his patients' ability to pay and training future generations of medical professionals, Dr. Cheema constantly puts others first and tries to make the world a better place.

This is not someone who simply pulls out his checkbook: Dr. Cheema gives back through his time, energy, and talents, investing in and betting on the health and wellness of the community at large. In granting downward variances, courts have recognized the value of such contributions. *See, e.g., United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (*en banc*) (affirming downward variance to home detention and probation for defendant convicted of tax evasion who performed "charitable acts that involved not only money, but also his personal time"); *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (affirming downward departure because defendant's actions were "hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others").

In determining whether incarceration is reasonable and necessary, we also ask that the Court consider Dr. Cheema's poor and clearly declining health, and the corresponding burdens a custodial sentence would put on the federal prison system. Indeed, courts routinely vary downward based, at least in part, on the defendant's health and age. *See, e.g.,* Judgment and Defendant's Position on Sentencing at 2, *United States v. Popina*, No. 17-cr-68 (E.D. Va. Nov. 20, 2017), Dkt. 22 (three years' probation for "extremely sick" 26 U.S.C. § 7202 defendant who had a "heart condition and diabetes" among other ailments).

In *United States v. Taffaro*, 919 F.3d 947 (5th Cir. 2019), the Fifth Circuit affirmed a substantial downward variance where Mr. Taffaro was convicted of 12 counts of tax-related

offenses and faced a Guidelines range of 27-34 months.[13] In support of a variance, counsel noted, among other things, Mr. Taffaro's poor health and long medical history.[14] The district court found that a probationary sentence of 60 months was sufficient but not greater than necessary.

In *United States v. Manley,* a recent case in this district, the defendant pleaded guilty to employment tax violations and a tax loss of nearly one million dollars. At the time of sentencing, the defendant was 72 years old, had a pacemaker, and suffered from other medical conditions.[15] Judge Davis imposed a sentence of one day imprisonment and three years' supervised release despite a Guidelines range of 24-30 months.

Finally, only 6.9% of federal offenders are over 60 years old,[16] and our federal prison facilities and procedures are designed to accommodate much younger inmates, while the needs of the elderly are often ignored. *See* Jamie Fellner, *Old Behind Bars: The Aging Prison Population in the United States*, Human Rights Watch (Jan. 27, 2012) ("Prison officials are hard-pressed to provide conditions of confinement that meet the needs and respect the rights of their elderly prisoners.").[17] Thus, elderly inmates, "even if they are not suffering illness, can find the ordinary rigors of prison particularly difficult because of a general decline in physical and often mental functioning which affects how they live in their environments and what they need to be healthy, safe, and have a sense of well-being." *Id*. Elderly inmates are also much more vulnerable to abuse or threats by younger inmates. *See id*. These challenges accelerate the aging process, leading to

---

[13] *Id.* at 950 (concurrence, James, J.).

[14] *See* Sentencing Tr. at 8:21–22, *United States v. Taffaro*, No. 17-cr-135 (E.D. La. June 8, 2018), Dkt. 155.

[15] *See* Defendant's Position on Sentencing at 5, 8, *United States v. Manley*, No. 17-cr-53 (E.D. Va. Sept. 15, 2017), Dkt. 19.

[16] U.S. Sentencing Comm'n, *Quick Facts, March 2021,* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/BOP_March2021.pdf

[17] https://www.hrw.org/report/2012/01/27/old-behind-bars/aging-prison-population-united-states.

permanent physical and psychological impairments. The U.S. Department of Justice itself recognizes this reality:

> Elderly inmates . . . reveal accelerated signs of aging and deterioration of health [including] increased rates of incontinence, sensory impairment, impaired flexibility, respiratory illnesses, cardiovascular disease, and cancer. . . . [T]heir aging processes [accelerate] to an average of 11.5 years older than their chronological ages after age 50. Ordinary cognitive impairments of age aside, [elderly offenders experience] decreased sensory acuity, muscle mass loss, intolerance of adverse environmental conditions, dietary intolerance, and general vulnerability precipitate collateral emotional and mental health problems.[18]

Moreover, in 2015, the Office of the Inspector General determined that "aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs,"[19] that "medical costs are increasing at a rate higher than the BOP's total budget," and that rate is "driven by medications and medical trips outside of institutions."[20]

Dr. Cheema's medical issues are not minor. They require constant vigilance by his doctors and costly medication, treatments, and, at times, immediate surgical procedures. The Government asserts that because Dr. Cheema had these ailments when he committed his tax crime, he should not receive a lighter sentence.[21] Dkt. 28 at 19–20. The fact of the matter is that Dr. Cheema has been living on borrowed time, and any period of incarceration will take a debilitating physical toll, aggravating the conditions from which he already suffers and likely creating new medical difficulties. In light of his underlying conditions, exposure to COVID-19 variants or other

---

[18] Nat'l Inst. of Corr., U.S. Dep't of Just., *Correctional HealthCare: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* 10 (2004), https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf.

[19] Off. of the Inspector Gen., U.S. Dep't of Just., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* 51 (last revised Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf.

[20] *Id*. at 10.

[21] The Government also asserts that Dr. Cheema engaged in physical labor to start the restaurant. This is assertion is not supported by any evidence.

infections could result in death. Dr. Cheema's age and medical condition, coupled with his history and philanthropy, provide strong support for a non-custodial sentence, which would hold Dr. Cheema accountable while avoiding further strain on an already stretched prison system.

### 3)   The Purpose of Sentencing

Each sentence imposed under the Guidelines should be determined based on the relevant facts and circumstances, and designed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The need for a sentence to promote respect for the law does not invariably weigh in favor of imposing incarceration whenever it is among the available sentencing options. In *Gall*, the Supreme Court agreed that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." 552 U.S. at 54.

By accepting responsibility during the investigation, Dr. Cheema demonstrated his respect for the law, the government, and this court. *See United States v. Moore,* 344 Fed. App'x. 767, 769–70 (3d Cir. 1990) (affirming probation where defendant pleaded guilty to tax evasion and faced an advisory Guidelines range of 18-24 months). Moreover, incarceration is not required to provide Dr. Cheema with additional educational or vocational training, medical care, or other correctional treatment. He does not drink alcohol or use illegal drugs, has no addictions, and does not need the assistance of the BOP to access medical care. *See* 18 U.S.C. § 3582(a) ("imprisonment is not an appropriate means of promoting correction and rehabilitation.").

35

We recognize that any sentence must satisfy the goal of affording specific and general deterrence to criminal conduct as contemplated by 18 U.S.C. § 3553(a)(2)(B), and we submit that a probationary sentence with home detention and community service promotes these objectives.

First, Dr. Cheema's family, friends, neighbors, professional colleagues, employers, and anyone with access to the internet are aware of his conduct and conviction.[22] "Since this case has started, I have seen him deteriorating .... I know he would be of better use giving back to the community with the skills he has." Ex. A at 15 (Ltr. from Amer Rauf); *see also* Ex. A at 6 (Ltr. from Kamran Cheema) ("I have seen firsthand how much it pains him to have not met his tax obligations[.]"). Moreover, Dr. Cheema is already suffering the collateral consequences of his criminal conduct, including unemployment, substantial, non-dischargeable tax liabilities that encumber his limited assets and any future income, and the loss of his ability to practice medicine. Based on the foregoing, and the fact that Dr. Cheema will never again be an employer, there is no risk of recidivism or need for specific deterrence in this case.

Second, general deterrence does not require incarceration. *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010). Indeed, empirical evidence suggests that incarceration does little to deter crime. *See* Nat'l Inst. of Just., U.S. Dep't of Just., *Five Things About Deterrence* 1 (May 2016) ("Sending an individual convicted of a crime to prison isn't a very effective way to deter

---

[22] *See* U.S. Dep't of Just., *Press Release: Doctor Pleads Guilty to Not Paying Employment Tax – Admits Did Not Pay IRS More Than $2 Million in Employment and Corporate Taxes* (Feb. 12, 2021), https://www.justice.gov/usao-edva/pr/doctor-pleads-guilty-not-paying-employment-taxes; American Kahani, *Virginia Physician Dr. Arshad Pervez Cheema Pleads Guilty to Tax Fraud* (Feb. 19, 2021), https://americankahani.com/community/virgina-physician-dr-arshad-pervez-cheema-pleads-guilty-to-tax-fraud/; Michael O'Connell, *Doctor Pleads Guilty to Not Paying Federal Payroll Taxes,* Patch (Feb. 16, 2021), https://patch.com/virginia/herndon/doctor-pleads-guilty-not-paying-federal-payroll-taxes; Laura Dyrda, *Physician Guilty of Dodging $2M in employment, corporate taxes*, Becker ASC (Feb. 16, 2021), https://www.beckersasc.com/asc-news/physician-guilty-of-dodging-2m-in-employment-corporate-taxes.html.

crime.").[23] The Government argues otherwise, asserting that a 30-month sentence "would put other would-be tax cheats on notice that willful violations of the internal revenue laws will be punished with a real possibility of imprisonment." Dkt. 19 at 16. But this argument assumes that a would-be offender would only commit a crime "when the benefit . . . outweighs the product of the likelihood of getting caught and brought to justice . . . multiplied by the detrimental impact of the punishment." *United States v. Courtney,* 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M. 2014).  Yet, this theory "does not work in the real world; it has been falsified by empirical research …. If the model held true in the real world, doubling the punishment severity of a crime would deter the same portion of potential criminals as doubling the certainty of detection, and halving a crime's punishment would galvanize the same number of new criminals and halving the detection rate." *Id*. Instead, "[a]n avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world." *Id*.

It is the existence of "the sentencing guidelines and statutory sentencing provisions" that have the largest effect deterrent effect. *United States v. Del Campo*, 695 F. App'x 453, 459 (11th Cir. 2017). Both "send a clear message that the presumptive penalty" for criminal conduct is imprisonment. *Id*. In other words, "what effects general deterrence … is the probability and *expected* severity of punishment attending a given offense, rather than the extent of an upward or downward variance in an outlier case." *Id*. (affirming a non-custodial sentence for a defendant convicted of a $1.38 million bank fraud and holding "[a]s far as this court can tell, there do not appear to be many 71-year-old title attorneys in poor health awaiting our decision to determine whether helping their friends to commit bank fraud will be 'worth it.'").

---

[23] https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

The Court need not use Dr. Cheema as an example to deter others. For potential wrongdoers paying attention to Dr. Cheema's conduct, conviction, and sentence, the punitive quality of the charges, the booking process, the public shame, the substantial restitution imposed, and the loss of his medical license are more than capable of deterring most individuals considering similar tax offenses. *See United States v. Mousseau*, 599 F. App'x 726, 727 (9th Cir. 2015) (payment of restitution "serves penal objectives, such as deterrence, rehabilitation and retribution."); *United States v. Pauley*, 511 F.3d 468, 474–75 (4th Cir. 2007) (affirming that district court's consideration of defendant's loss of teaching license and state pension was consistent with "3553(a)'s directive that the sentence reflect the need for 'just punishment'"); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 194 (E.D.N.Y. 2016) (finding that narcotics defendant was already "sufficiently punished" by permanent loss of her future teaching career); *see also United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.").

Finally, the most important aspect of deterrence – the certainty of punishment – is firmly in place. Dr. Cheema committed a crime and will be punished. Under the facts and circumstances of this case, a sentence of probation with home detention and community service would be "sufficient, but not greater than necessary" to "afford adequate deterrence to criminal conduct." U.S.C. § 3553(a)(2)(B); *United States v. Hodges*, No. 10-cr-624, 2014 WL 3695491, at *2 (E.D.N.Y. July 23, 2014) (holding general deterrence may be achieved by a felony conviction and its collateral consequences).

### 4)     The Kinds of Sentences Available

This Court has the authority and may exercise its discretion to consider a wide range of alternatives to imprisonment, and must consider the kinds of sentences available, including

probation, supervised release, and periods of home detention. *See* 18 U.S.C. §§ 3551(b)(l), 3561, 3562, 3563(b)(4), and 3583; U.S.S.G. § 5Fl.2. In fact, 18 U.S.C. § 3553(a)(3) requires consideration of sentences *other than* imprisonment, and the severity of a non-custodial sentence should not be underestimated. As the Supreme Court stated in *Gall:*

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights,* 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which ever citizen is entitled.") (quoting *Griffin v. Wisconsin,* 483 U.S . 868, 874 (1987)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. § 5Bl.3. Most probationers are also subject to individual 'special conditions' imposed by the court.

552 U.S. at 48 (footnote omitted). The Court agreed that a sentence of probation reflected the seriousness of Gall's offense and that no term of imprisonment was necessary:

> Any term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who, the Court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life. The Defendant's post-offense conduct indicates neither that he will return to criminal behavior nor that the Defendant is a danger to society. In fact, the Defendant's post-offense conduct was not motivated by a desire to please the Court or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life.

*Id.* at 44–45.

Since *Gall*, federal courts have sentenced numerous defendants in criminal tax prosecutions to probation. For example, in *United States v. Venuti,* No. 10-cr-235 (D. Md. Nov. 2, 2010), the defendant was a former IRS employee and principal of the global accounting firm of KPMG. John Venuti worked for the IRS from 1974 to 1983, including a period during which he served as Division Chief of the Tax Treaty and Technical Services Division. His gross income for

2001 through 2006 exceeded $3.5 million, and the tax due over that same period was approximately $800,000. Mr. Venuti pleaded guilty to three counts of willful failure to file tax returns in violation of 26 U.S.C. § 7203 and acknowledged seven years of unfiled returns with a tax loss of approximately $800,000. The court sentenced Mr. Venuti to three years of probation, with 6 months of home detention and 400 hours of community service.[24]

In *United States v. Paper,* No. 13-cr-00599 (D. Md. Mar. 11, 2014), a dentist pleaded guilty to one count of willfully making and subscribing to a false tax return in violation of 26 U.S.C. § 7206(1). Facing an advisory Guidelines range of 18-24 months, the court sentenced Dr. Paper to 3 years of probation, 12 months of home detention, and 250 hours of community service providing *pro bono* dental care.[25] *See also* Judgment, *United States v. Danh*, No. 20-cr-318 (D. Md. May 21, 2021), Dkt. 28 (three years' probation following guilty plea to violations of 26 U.S.C. § 7202 and 18 U.S.C. § 371); Judgment, *United States v. Duva*, No. 29-cr-181 (E.D. Pa. Sept. 17, 2019), Dkt. 20 (three years' probation following guilty plea to violation of 26 U.S.C. § 7202); Judgment, *United States v. Popina*, No. 17-cr-68 (E.D. Va. Nov. 20, 2017), Dkt. 22 (same); Judgment, *United States v. Po*, No. 15-cr-367 (E.D. Pa. May 11, 2017), Dkt. 75 (five years' probation following guilty plea to violations of 26 U.S.C. § 7202 and 18 U.S.C. § 371); Judgment, *United States v. Key*, No. 15-cr-37 (E.D. Va. May 6, 2015), Dkt. 17 (three years' probation following guilty plea to violation of 26 U.S.C. § 7202).

Even where a defendant's conduct resulted in a substantial loss, courts have found that a non-custodial sentence is sufficient to meet the objectives of the Guidelines. For example, in *United States v. Angiulo*, No. 20-cr-10218 (D. Mass. Mar. 18, 2021), the owner of a towing

---

[24] Judgment, *United States v. Venuti,* No. 10-cr-235 (D. Md. Nov. 2, 2010), Dkt. 16.
[25] Judgment, *United States v. Paper,* No. 13-cr-599 (D. Md. Mar. 11, 2014), Dkt. 19.

company pleaded guilty to one count of willfully failing to account for, collect and pay over employment tax in violation of 26 U.S.C. § 7202, and one count of evading cash transaction reporting requirements under the Bank Secrecy Act in violation of 31 U.S.C. §§ 5324(a)(1) and (d)(2). Mr. Angiulo conceded that his criminal conduct resulted in a tax loss between $1,500,000 and $3,500,000. His advisory Guidelines range was 37-46 months. The district court accepted the plea agreement and sentenced Mr. Angiulo to 42 months of probation, including 18 months of home detention, and substantial community service, as well as restitution in the amount of $1,769,486 and forfeiture in the amount of $430,000.[26]

### *Home Detention*

The Sentencing Commission further recognizes that home detention is a permissible special condition of probation as a substitute for imprisonment. U.S.S.G. § 5F1.2. Home detention is defined as:

> .... a program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs, and such other times as may be specifically authorized. Electronic monitoring is an appropriate means of surveillance for home detention. However, alternative means of surveillance may be used if appropriate.

U.S.S.G. § 5Fl.2 (Commentary). Home detention has gained acceptance in the federal criminal justice community as a credible sanction and alternative to incarceration.[27] Judges have imposed home detention more frequently as they have "learned more about what it offers" and discovered

---

[26] Judgment, *United States v. Angiulo,* 20-cr-10218 (D. Mass. Mar. 18, 2021), Dkt. 38.
[27] Darren Gowen, *Overview of the Federal Home Confinement Program,* 64 Federal Probation, 1, 12 (Dec. 2000), https://www.uscourts.gov/sites/default/files/64_2_2_0.pdf.

its cost effectiveness.[28]

### *Community Service*

Community service is also recognized by federal and state courts as "a burdensome penalty that meets with widespread public approval, is inexpensive to administer ... produces public value ... and ... can to a significant extent be scaled to the seriousness of crimes."[29]  Community service is "a way for the offender to repay or restore the community. It is a flexible, personalized, and humane sanction. Community service is practical, cost-effective, and fair - a 'win-win' proposition for everyone involved."[30] The Guidelines clearly provide that community service may be ordered as a condition of probation.[31]

The Office of the U.S. Courts recognizes that "community service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation ... It restricts offenders' personal liberty ... allows offenders to atone or 'make the victim whole' in a constructive way ... [and] may be regarded as ... a form of symbolic restitution when the community is the victim."[32] In selecting an appropriate candidate to perform community service, U.S. Probation and Pretrial Services recommends:

> .... Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. But not every offender is a good candidate for community service ... Courts look for offenders with personal and social stability, who are willing, motivated, and who have no criminal history of violence.[33]

---

[28] *Id.* at 11.

[29] Michael Tonry, Nat'l Inst. of Just., *Intermediate Sanctions In Sentencing Guidelines* 11 (1997), https://www.ojp.gov/pdffiles/165043.pdf.

[30] Off. of Prob. & Pretrial Servs., Admin. Off. U.S. Court, *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service* (2005), http://www.uscourts.gov/misc/revision-community.pdf

[31] U.S.S.G. § 5F1.3.

[32] *Supra*, note 30.

[33] *Id.*

In *United States v. Shamilzadeh,* No. 04-cr-1094 (E.D.N.Y. Apr. 1, 2008), a major fraud case in the Eastern District of New York, Judge John Gleeson spoke to the value of community service:

> The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, cost financial institutions, what, $110 million[.]

> * * * * *

> In fact, you know, one might say how could, no matter what the timing of the cooperation, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?

> But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature, given your age and your physical circumstances. I don't think the goals of sentencing here require you to be incarcerated.

> I'm placing you on probation for a period of five years. One special condition of probation would be that you be in home detention for a period of six months. Another is that you perform 500 hours of community service. It strikes me that you can do some good in your community. You already have. It seems to me you deserve it. The combination of circumstances in your case makes you worthy of serving your punishment in a manner that's a little more constructive than going to jail.[34]

---

[34] Ex. E, Defendant's Sentencing Memorandum at 27–28, *United States v. Warner*, No. 13-cr-731 (N.D. Ill. Jan. 14, 2014), Dkt. 24 (quoting Sentencing Transcript, *United States v. Shamilzadeh,* No. 04-cr-1094 (E.D.N.Y. Apr. 1, 2008)).

In a case involving an offshore account and tax evasion with a combined financial penalty of over $80 million, Senior Judge Charles Kocoras in the Northern District of Illinois imposed a sentence of community service stating:

> The hard question in this case is whether or not, given all of the relevant circumstances of the crimes and of the defendant, himself, some period of incarceration should be imposed ....
>
> As I stated earlier, the sentencing statute and factors described run in different directions. So, it is left to me to weigh them all and balance them, as best as I am humanly able. While the crime for which he stands convicted is a serious one, it goes to the essence of how we govern ourselves.
>
> One of the considerations for me is whether society would be better off with Mr. Warner in jail or whether it would be best served by utilizing his talents and beneficence to help make this a better world.
>
> Mr. Warner will be placed on probation for a period of two years , with the following conditions : That he will provide at least 500 hours of community service. This has been, for the parties and for me, as well, as most sentencings are, a difficult case. But, in the end []as you can tell from my remarks, what I found most significant is that, yes, he committed crimes; he hid; he acted in a way a lot of other people act, who try to cheat the government. And I spent of a lot of hours trying to figure out why people do that …
>
> I do not know the motivations; and, frankly, I do not know Mr. Warner's either. But it is not that, that triggers whatever a proper sentence will be in this case because in Mr. Warner's case, as I have alluded to quite frequently in this presentation of my own, he did things that I am not aware anyone else does. Certainly, not anyone before me. And it would be unjust for me to ignore that, not measure it and not say, in the end, that trumps all of the ill-will and misconduct he engaged in.
>
> And really - and I believe this with all of my heart - society will be best-served by allowing him to continue his good works.[35]

Like Warner and Shamilzadeh, Dr. Cheema is an outstanding candidate for community service given his extreme remorse for his conduct, good character and reputation, strong work

---

[35] Ex. F, Sentencing Tr., at 50–53, *United States v. Warner*, No. 13-cr-731 (N.D. Ill. Jan. 14, 2014), Dkt. 33.

ethic, and history of extensive service to the community. He is a first-time offender, he has no history of violence, and he is highly motivated to continue aiding others, as is evident from his extensive past charitable efforts. Allowing Dr. Cheema to continue to serve the community through services he is permitted to do without his medical license (training, mentoring, serving as a patient navigator, etc.) would serve the needs of justice by taking his time, efforts, and special skills and putting them to use in a constructive and useful manner.

Finally, incarceration will result in the suspension of Dr. Cheema's Social Security benefits.[36] Not only would this eliminate a key source of restitution, *see infra*, incarceration may also result in the cancellation of Dr. Cheema's much needed medical insurance. *Id.* at 5.

### 5)    The Guidelines

Commentators have criticized the overemphasis on loss as the single most significant factor in determining the advisory range in white collar cases,[37] and courts have echoed agreement. *See United States v. Parris,* 573 F. Supp. 2d 744, 753 (E.D.N.Y. 2008) (J. Block) (varying from an advisory range of 360-life to 60 months, noting that, "the Sentencing Guidelines for white-collar crime [can produce] a black stain on common sense"); *Adelson,* 441 F. Supp. 2d at 512 (varying from an advisory range of life to three and half years, contending that "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.").

While it is reasonable for tax offenders to face incarceration in many cases, strict application of the Guidelines and/or imposition of a prison sentence within the advisory Guidelines

---

[36] *See* 20 C.F.R. § 404.468; *see also* Social Sec. Admin., *What Prisoners Need to Know* 2 (Dec. 2018), https://www.ssa.gov/pubs/EN-05-10133.pdf.

[37] *See, e.g.*, Alan Ellis, *et al*, *At a "Loss" for Justice-Federal Sentencing for Economic Offenses*, 25 WTR Crim. Just. 4, 35 (2011), https://alanellis.com/at-a-loss-for-justice-federal-sentencing-for-economics-offenses-alan-ellis-john-r-steer-and-mark-h-allenbaugh/.

range would be more than necessary to meet the purposes of sentencing in this case.

### 6)      Pertinent Policy Statements of the Sentencing Commission

In November 2010, the Guidelines were amended, increasing a judge's ability to impose sentences that include alternatives to incarceration. In support of the amendments, the Sentencing Commission explained its multi-year study of alternatives to incarceration: "The Commission initiated this study in recognition of increased interest in alternatives to incarceration by all three branches of government and renewed public debate about the size of the federal prison population and the need for greater availability of alternatives to incarceration for certain nonviolent first offenders."[38] Here, a variance sentence of probation with home detention and community service recognizes and addresses the issues and concerns that prompted the Commission's study.

### 7)      The Need to Avoid Unwarranted Disparities Among Similar Offenders

Under 18 U.S.C. § 3553(a)(6), a district court is instructed to consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" when imposing a sentence. A review of recent federal criminal tax prosecutions shows that a substantial downward variance in this case is consistent with sentences imposed on similarly situated offenders.

The Sentencing Commission reported 547 sentences imposed from October 1, 2018 through September 30, 2019, where the primary offense was tax-related.[39] Of those cases, only 27.1% (148 of 547) received sentences within or above the Guidelines range.[40] Of the cases where

---

[38] U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* 1 (May 3, 2010), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20100503_RFP_Amendments_0.pdf.

[39] U.S. Sentencing Comm'n, *2019 Annual Report & Sourcebook* 46 tbl. 4 (2020), https://www.ussc.gov/research/sourcebook-2019.

[40] *See id.* at 90 tbl. 31, 97 tbl. 36.

the primary offense was tax-related and the court varied downward based on factors under 18 U.S.C. § 3553(a), the median sentence involved only 8 months of incarceration with a median decrease of 12 months.[41]

This trend continued the following year, albeit with fewer cases during the pandemic. The Sentencing Commission reported 365 sentences imposed from October 1, 2019 through September 1, 2020, where the primary offense was tax related.[42] Only 27.7% (101 out of 365) received sentences within the Guidelines range, and only one received an upward variance.[43] The median downward variance was 64.8% of the Guidelines range, with a median sentence imposed of six months.[44] *See e.g.*, Judgment, *United States v. Barbour*, No. 19-cr-174 (E.D. Va. Nov. 23, 2020), Dkt. 132 (nine months of incarceration for defendant convicted of employment tax violations with a tax loss of approximately $600,000).

In *United States v. Pursley*, No. 18-cr-575 (S.D. Tex. Aug. 12, 2020), following a trial, an attorney was convicted of conspiring to defraud the United States and three counts of tax evasion. Mr. Pursley "designed a complex scheme to defraud the United States out of more than $6 million dollars in tax revenue by disguising the repatriation of more than $18 million in unreported, offshore income as legitimate stock purchases." [45] The government described the "extensive" affirmative steps that Mr. Pursley took to hide the fraudulent scheme, including causing the creation of sham companies and fraudulent records. *Id.* at 4. The government also noted that Mr.

---

[41] *Id.* at 101 tbl. 40.
[42] U.S. Sentencing Comm'n, *2020 Annual Report & Sourcebook* 90 tbl. 31 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.
[43] *Id.*
[44] *Id*. at 101 tbl. 40.
[45] Gov't Sentencing Memorandum at 1, *United States v. Pursley*, No. 18-cr-575 (S.D. Tex. July 13, 2020), Dkt. 256.

Pursley refused to accept responsibility or show remorse for his crime, instead "wag[ing] a scorched-earth campaign against the government's trial witnesses[.]" *Id.* at 1. The government sought a prison sentence within the Guidelines range of 151-188 months. *Id.* at 2. Instead, the court imposed a sentence of just 24 months.[46] Unlike Mr. Pursley, Dr. Cheema cooperated fully in the investigation, accepts full responsibility for his criminal conduct, has spent a lifetime serving the public, and is deeply remorseful. Dr. Cheema is surely more deserving of mercy and leniency.

In *United States v. Betancourt*, No. 19-cr-20684 (S.D. Fla. Mar. 11, 2020), the defendant pleaded guilty to one count of violating 26 U.S.C. § 7202 and admitted to causing a tax loss of nearly $11 million. In its sentencing memorandum,[47] the government alleged an extended pattern of failing to pay employment taxes dating back to 2002. *Id.* at 6 ("[T]he long history of failing to pay employment taxes heightens his culpability."). Mr. Betancourt also failed to file any personal income tax returns or pay any personal income tax since 2009. *Id.* Despite a Guidelines range of 46-57 months, the court sentenced Mr. Betancourt to 24 months' incarceration. Given Dr. Cheema's significantly less egregious circumstances and this Court's discretion to impose a sentence that reflects his good works and substantial medical issues, a more substantial downward variance is warranted.[48] *See also* Judgment, *United States v. Choi,* No. 20-cr-6 (D.D.C. Oct. 15, 2020), Dkt. 29 (downward variance from 46-57 months to 21 months for violation of 26 U.S.C. § 7202 with a tax loss of more than $11 million).

This Court has granted downward variances, including down to probation, in recent cases based on a defendant's age, health conditions, good works, and other mitigating factors. In *United*

---

[46] Judgment, *United States v. Pursley*, No. 18-cr-575 (S.D. Tex. Aug. 12, 2020), Dkt. 265.
[47] Gov't Sentencing Memorandum, *United States v. Betancourt*, No. 19-cr-20684 (S.D. Fla. Mar. 5, 2020), Dkt. 19.
[48] Judgment, *United States v. Betancourt*, No. 19-cr-20684 (S.D. Fla. Mar. 11, 2020), Dkt. 22.

*States v. Popina*, the defendant engaged in a pattern of criminal conduct resulting in a tax loss of nearly $1 million. The defendant also had significant medical conditions including diabetes, heart disease, and obesity. Judge Davis imposed a probationary sentence of three years.[49] Similarly, in *United States v. Manley*, Judge Davis imposed a sentence of only one day with three years of supervised release on a defendant who was 72 years old with a heart condition, following a guilty plea to employment tax offenses, a loss of nearly $1 million, and a Guidelines range of 24-30 months.[50] Finally, in *United States v. Ragsdale*, where the defendant, 58 years old, pleaded guilty to employment tax crimes causing a tax loss of nearly $400,000, Judge O'Grady varied down from a Guidelines range of 18-24 months to a sentence of 20 days.[51] *See also* Judgment, *United States v. Ramanulla*, No. 15-cr-181 (E.D. Va. Oct. 23, 2015), Dkt. 21 (four months' incarceration despite Guidelines range of 24-30 months after guilty plea to § 7202).

Other district courts are applying similar variances. In *United States v. DiFabio*, a famous pizza chef received a sentence of 30 days in prison despite a Guidelines range of 30-37 months and a tax loss of $816,954, in recognition of his strong reputation for creating jobs in local communities, hiring those who need second-chances, and donating entire days' worth of sales to charities.[52] In *United States v. Abramove*, the owner of a taxicab company and auto repair shop received a sentence of three years' probation despite a Guidelines range of 18-24 months, where he led an otherwise law abiding life, was charitable and a leader in the Staten Island Jewish community, was a good employer, and did not personally profit from the failure to pay tax.[53]

---

[49] Judgment, *United States v. Popina*, No. 17-cr-68 (E.D. Va. Nov. 20, 2017), Dkt. 22.
[50] Judgment, *United States v. Manley,* No. 17-cr-53 (E.D. Va. Sept. 15, 2017), Dkt. 23.
[51] Judgment, *United States v. Ragsdale,* No. 18-cr-13 (E.D. Va. May 2, 2018), Dkt. 31.
[52] Judgment, *United States v. DiFabio*, No. 18-cr-262 (D. Conn. Apr. 29, 2021), Dkt. 37.
[53] Judgment, *United States v. Abramove*, No. 16-cr-613 (S.D.N.Y. Apr. 5, 2017), Dkt. 33.

Even where a defendant lacks the lifetime of philanthropy and public service, courts have granted substantial downward variances in cases involving tax losses greater than $1 million. In the Government's own case in support of a Guidelines sentence, *United States v. Gazdick*, Dkt. 19 at 18, this Court granted a *51% downward variance* from a Guidelines range of 37-46 months to 18 months, despite a tax loss of more than $5 million and prior convictions for bank and wire fraud.[54] The Court took into account the defendant's good works within the community, his good intentions with respect to his intent to pay the IRS, and his medical condition. *Id.* (Sentencing Tr. at 32:1–11). Similarly, in *United States v. Gogineni*, the court granted a downward variance from a Guidelines range of 21-27 months to a sentence of 11 months despite a tax loss of over $980,000.[55] Dr. Cheema's lifetime of service and philanthropy, advanced age, and extremely poor health all counsel for a greater variance those granted in *Gazdick* and *Gogineni*.

The Government cites *United States v. Harper*, No. 18-cr-25 (W.D. Va.) to justify a Guidelines sentence for Dr. Cheema, but ignores distinguishing factors. Dkt. 19 at 18. Mr. Harper's tax fraud occurred "over at least an 18-year period" and caused "at least $7.6 million" in tax losses.[56] Dr. Cheema's conduct occurred over a shorter period of time and caused a smaller loss. Additionally, "at no time was [Mr. Harper] ever behind or late in paying bills to other vendors and creditors" and so had "no justifiable excuse" for failing to pay.[57] Dr. Cheema, in contrast, had amassed a substantial amount of debt at the time he started the Grand Trunk, and in fact started the restaurant with the hope that it would help dig him out. Finally, Mr. Harper "[d]espite knowing that he was under criminal investigation … continued his criminal conduct for the subsequent four

---

[54] Judgment, *United States v. Gazdick,*, No. 19-cr-200 (E.D. Va. Nov. 8, 2019), Dkt. 25.
[55] Judgment, *United States v. Gogineni*, No. 20-cr-81 (E.D. Va. Feb. 2, 2021), Dkt. 23.
[56] Gov't Sentencing Memo at 16, *United States v. Harper*, No. 18-cr-25 (W.D. Va. Nov. 9, 2018), Dkt. 16.
[57] *Id*.

years" displaying "a bold and flagrant disregard for the law." *Id.* at 20. Dr. Cheema on the other

hand, cooperated from the beginning. Far from supporting the government's position that Dr.

Cheema should receive a Guidelines sentence, *Harper* supports the proposition that such sentences

are imposed when the defendant engages in egregious conduct beyond the elements of the offense,

such as using unreported income or tax withheld to support lavish lifestyles, obstructing the

investigation, and continuing noncompliance.[58] *See also* Sentencing Tr. at 10:6–8, 18:9–13 and

Judgment, *United States v. Russell Rucker*, No. 19-cr-6 (S.D. W.Va. Jan. 27, 2020), Dkts. 62 and

52 (imposing Guidelines sentence where defendant refused to cooperate with IRS investigators,

including by concealing receipts and transferring funds to various bank accounts to avoid levies).[59]

The Government cites two additional sentences recently imposed, both of which involve

facts and circumstances not present in this case. In *United States v. Denko,* the defendant owned

and operated contracting businesses in Queens, New York. "[F]from 2010 through 2014, Mr.

Denko cashed more than $5 million in checks made out to companies he owned and operated to

fund an 'off the books' cash payroll. He did not report the cash wages to the IRS, and did not pay

to the IRS the employment taxes arising from the cash payroll."[60] In its sentencing memorandum,

the Government noted that "[f]or part of the period during which the defendant carried out this

---

[58] Sentencing Tr. at 54:3–6 and Judgment, *United States v. Harper*, No. 18-cr-25 (W.D. VA. Nov. 16, 2018), Dkts. 43 and 36; *see*

[59] The Government cites *United States v. Hassebrock*, 663 F.3d 906 (7th Cir. 2011) for the proposition that Dr. Cheema deserves a significant term of incarceration, Dkt. 19 at 14. Unlike Dr. Cheema, "Hassebrock "joined a fictitious Native american tribe to avoid his tax obligation, [] attempted to pay taxes with fraudulent sight drafts …. [and] fail[ed] to accept responsibility for his actions." *Hassebrock*, 663 F.3d at 922. Indeed, Hassebrock was a self-proclaimed "tax protestor." Dr. Cheema stands in stark contrast to Hassebrock given that he is not a tax protestor and never committed fraud to avoid taxes.

[60] U.S. Dep't of Just., *Press Release: New York Plumbing Contractor Sentenced to 20 Months in Prison for Employment Tax Fraud* (Jun. 7, 2021)*,* https://www.justice.gov/opa/pr/new-york-plumbing-contractor-sentenced-20-months-prison-employment-tax-fraud.

conduct, the defendant was on probation for a conviction in state court of submitting falsified documents to the New York City Department of Citywide Administration Services.[61] The Government also argued that Mr. Denko "did not just fail to pay his taxes, he took multiple deliberate steps to conceal his payroll from his accountant and the IRS and facilitate his tax fraud by diverting checks made out to his business to a check-casher and running a cash payroll. Pretty much every time he cashed a check, which he did approximately 150 times, or handed out cash, the defendant knew he was doing so to cheat the government, time and time again, year after year."[62] The Government requested a Guidelines sentence of 27-33 months.[63] Notwithstanding Mr. Denko's egregious misconduct, which is not present in this case, the Court granted a 30% downward variance. Mr. Denko is not similarly situated to Dr. Cheema and a similar sentence would result in an unwarranted disparity.

The Government also cites *United States v. Rebecca Adams,* in which the District Court for the Middle District of North Carolina sentenced the owner of a temporary staffing business to 42 months' incarceration.[64] Ms. Adams and her daughter and co-defendant, Elizabeth Wood, owned and operated several staffing companies and conspired to willfully fail to collect, account for, and pay over more than $2 million withheld from employee wages.  Ms. Adams and Ms. Woods used the funds to "to pay for personal expenses, such as personal maid and landscaping services, vacations, and pet spa and grooming services."[65] They also failed to file tax returns and filed false tax returns.[66] Ms. Adams engaged in this conduct while her daughter was serving a prior

---

[61] United States' Sentencing Memorandum at 2–3, *United States v. Denko*, No. 20-cr-15 (E.D.N.Y. May 28, 2021), Dkt. 16.
[62] *Id.* at 6.
[63] *Id.* at 1.
[64] Judgment, *United States v. Adams,* 19-cr-546 (M.D.N.C. Nov. 13, 2020), Dkt. 56.
[65] Indictment ¶ 8(c), *United States v. Adams,* 19-cr-546 (M.D.N.C. Oct. 28, 2019), Dkt. 1.
[66] *Id.* ¶ 8(g).

sentence of incarceration in 2015.[67] Both were indicted on October 28, 2019 and arrested a week later.[68] Ms. Wood pleaded guilty first and was sentenced to 18 months.[69] With the majority of the docket under seal, it is difficult to determine the advisory Guidelines range, but it appears that she received a substantial downward variance. In light of the allegations in the indictment and the conduct during her daughter's prior incarceration, it is no surprise that the court imposed a substantial sentence on Ms. Adams. Again, this defendant is not similarly situated to Dr. Cheema and the imposition of a similar sentence would constitute an unwarranted disparity.

Dr. Cheema's extraordinary efforts to assist those in his communities throughout his life, coupled with his cooperation during the investigation, age and poor health, stand in stark contrast to the conduct of other defendants, including many of those cited herein, who have received the benefit of substantial downward variance and probationary sentences. A probationary sentence with conditions of home detention and community service would prevent the sentencing disparity the Guidelines seek to avoid.

**8)      The Need for Restitution**

Dr. Cheema has agreed to full restitution. He is 66 years old, unemployed, in poor health, and without a license to practice medicine. However, he is entitled to Social Security benefits.

The IRS is authorized to levy Social Security benefits to satisfy Dr. Cheema's restitution based assessments, which will occur following the entry of a judgment in this case. 26 U.S.C. § 6201 (a)(4). The IRS may levy up to 15% of the benefits under the Federal Payment Levy Program, 26 U.S.C. § 6331(h)(2) and (3), or up to 100% of the benefits under the traditional levy

---

[67] U.S. Dep't of Just., *Press Release: Owner of North Carolina Temporary Staffing Firms Sentenced to Prison for Employment Tax Fraud* (Oct. 7, 2020),
[68] Indictment and Arrest Warrant Return, *United States v. Adams,* 19-cr-546 (M.D.N.C. Oct. 28, 2019), Dkt. 1, 10.
[69] Judgment, *United States v. Woods,* 19-cr-546 (M.D.N.C. Jul. 9, 2020), Dkt. 50.

procedure set forth at 26 U.S.C. § 6331(a), subject to certain exemptions.[70]

However, as noted herein, if Dr. Cheema is incarcerated, his benefits will cease.[71]  Not only would this eliminate a valuable source of recovery, the failure to pay benefits will likely also result in the cancellation of Dr. Cheema's medical insurance. *Id.* at 5. Dr. Cheema would be forced to reapply for insurance, and if he leaves prison outside the general enrollment period, January to March, he will be left without insurance until the following year. *Id.* Moreover, he would not be insured until the July after he reapplies.[72]

In sum, Social Security benefits are critical to Dr. Cheema's ability to repay the government and his ability to manage his health. We implore the Court to consider this when determining the appropriate sentence.

## DR. CHEEMA'S PRECARIOUS HEALTH

Over the past 16 months, our society, including the criminal justice system, has faced unprecedented loss as a result of the COVID-19 pandemic. At least 256 federal inmates have died of COVID-19,[73] and despite the vaccinations, the BOP has confirmed active COVID-19 cases at 65 separate BOP facilities and 7 Residential Reentry Centers.[74]

---

[70] IRS Publication 1494, Tables for Figuring Amount Exempt from Levy on Wages, Salary and Other Income (Forms 668-W(ACS) and 668-W(ICS) (Rev. 2021), https://www.irs.gov/pub/irs-pdf/p1494.pdf.

[71] *See* 20 C.F.R. § 404.468; *see also* Soc. Sec. Admin., *What Prisoners Need to Know* at 2 (Dec. 2018), https://www.ssa.gov/pubs/EN-05-10133.pdf.

[72] Additional delays in Dr. Cheema's enrollment in Medicare Part B can be caused by the BOP's delay in providing the necessary documentation to prove that Dr. Cheema is no longer incarcerated. *Id.*

[73] The names of 256 of the federal inmates who have died from COVID-19 are recorded, along with brief descriptions of their lives. Federal Criminal Defense Clinic, University of Iowa Law School, *They Are Human Too: 256 Deaths in BOP Custody, An Incalculable Loss*, https://law.uiowa.edu/compassionate-release-work (last visited Jun. 9, 2021).

[74] Fed. Bureau of Prisons, *BOP: COVID-19 Update*, https://www.bop.gov/coronavirus/ (last visited Jun. 16, 2021).

Even though half of the staff and inmates within the BOP are vaccinated, prisons remain "powder kegs for infection," putting inmates and correctional staff at disproportionately high risk of contracting COVID-19. *United States v. Skelos*, No. 15-cr-317, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020). "Even a highly efficacious vaccine will have suboptimal preventive effects in high-spread, congregate settings[,]"[75] and the CDC recommendations for preventing COVID-19 transmission, such as spending time outdoors, distancing from others, and disinfecting frequently touched surfaces, remain incompatible with prison facilities and procedures. *See United States v. Zukerman*, No. 16-cr-194, 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) ("[I]nmates live in close quarters, share one large bathroom with only a handful of stalls and showers, and eat elbow-to-elbow at three-foot wide tables in the dining hall .... Such conditions make controlling the spread of COVID-19 more challenging and the risk to vulnerable inmates ... that much greater"). Thus, "even a vaccine with 90% efficacy will leave many people at ongoing risk for COVID-19."[76]

Particularly troublesome is the risk COVID-19 variants like Delta pose to BOP inmates and staff given that federal prisons are not sufficiently self-contained to prevent new outbreaks. *United States v. Ramos*, No. 18-cr-30009, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020). Indeed, the Delta variant may be "the most transmissible variant yet," "has fueled numerous waves of the pandemic around the world[,]" and vaccines are less effective in preventing its spread.[77] Indeed, according to Public Health England, more than 30% of all Delta variant patients in the UK

---

[75] Benjamin A. Barsky, *et al*, *Vaccination Plus Decarceration – Stopping Covid-19 in Jails and Prisons*, N. Engl. J. Med 2021 (Apr. 29, 2021), https://www.nejm.org/doi/full/10.1056/NEJMp2100609.

[76] *Id*.

[77] Chas Danner & Paola Rosa-Aguino, *What We Know About the Dangerous COVID B.1.617.2 (Delta) Variant*, N.Y. Mag: Intelligencer (last updated June 9, 2021), https://nymag.com/intelligencer/2021/06/covid-b-1-617-2-delta-variant-what-we-know.html.

had received at least one dose of the vaccine, and 45% of deaths from the Delta variant were vaccinated patients.[78]

At 66 years old, Dr. Cheema is in one of the highest risk demographics if he contracts COVID-19.[79]  The CDC has found that the rate of hospitalization for, and death as a result of, a severe COVID-19 infection increases with age.[80] Even leaving aside its short-term peril for Dr. Cheema, COVID-19 may well induce serious long-term medical complications that could degrade Dr. Cheema's quality of life and further shorten his lifespan, such as respiratory ailments, neurological injuries, and heart damage. As a result, incarceration poses an incalculable risk.[81] *Zukerman*, 2020 WL 1659880, at *6 (finding tax evasion defendant's conduct egregious but court "did not intend for [his] sentence to include incurring a great and unforeseen risk of severe illness or death") (cleaned up).

"Courts are empowered to consider health conditions as part of, and in conjunction with, the traditional sentencing factors described in § 3553(a)." *United States v. Jackson*, No. 19-cr-

---

[78] Nicola Davis, *Delta Variant Causes More than 90% of New Covid Cases in UK*, the Guardian (Jun. 11, 2021), https://www.theguardian.com/world/2021/jun/11/delta-variant-is-linked-to-90-of-covid-cases-in-uk.

[79] World Health Org., *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* 12 (Feb. 28, 2020), https://www.who.int/docs/defaultsource/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding a mortality rate of 1.3% among those aged 50-59).

[80] U.S. Center for Disease Control, *COVID-19 & Older Adults* (Updated May 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Jun. 9, 2021) (compared with 5-17 year olds, the rate of death is 1,300 times higher in 65-74 year olds).

[81] "[T]here are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism" are likely "safer serving sentences in home confinement rather than in BOP facilities." U.S. Att'y Gen., *Memorandum to Director of Bureau of Prisons re Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

00492, 2020 WL 2759601, at *2 (S.D.N.Y. May 26, 2020). Dr. Cheema's precarious medical condition counsels strongly in favor of a probationary sentence with conditions of home detention.

## **CONCLUSION**

Dr. Cheema's tax crime is serious. He accepts full responsibility and deeply regrets the harm he has caused to the Government, his employees, his family, his professional colleagues, his patients, and others who count on him to serve as a role model and mentor. He will spend the rest of his life making amends and recognizes that punishment is appropriate. However, "sentencing decisions represent instances in which the whole sometimes can be greater than the sum of the constituent parts." *United States v. Martin,* 520 F.3d 87, 95 (1st Cir. 2008). The combination of Dr. Cheema's acceptance of responsibility, early cooperation, close family ties, philanthropy, and lifetime of service support a downward variance to probation with home detention and community service. This sentence allows Dr. Cheema to make amends for his conduct, to give back to the community and those in need, and is clearly sufficient, but not greater than necessary.

Respectfully submitted,

June 16, 2021

*/s/ Jay R. Nanavati*
Jay R. Nanavati
Fed. Bar No. 44391
Kostelanetz & Fink, LLP
601 New Jersey Ave., NW, Suite 260
Washington, D.C. 20001
jnanavati@kflaw.com
*Counsel for Arshad Pervez Cheema*

*/s/ Caroline D. Ciraolo*
Caroline D. Ciraolo
Fed. Bar No. 453882
Kostelanetz & Fink, LLP
601 New Jersey Ave., NW, Suite 260
Washington, D.C. 20001
cciraolo@kflaw.com
*Pro Hac Counsel for Arshad Pervez Cheema*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 16, 2021, I filed the foregoing Sentencing Memorandum via ECF, causing service to be made upon counsel of record.


*/s/ Jay R. Nanavati*
Jay R. Nanavati